Steven J. Luckner
Jennifer Rygiel-Boyd
**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.**
10 Madison Avenue, Suite 400
Morristown, New Jersey 07960
Telephone: (973) 656-1600
Facsimile: (973) 656-1611
*Attorneys for Defendant Liberty Mutual
Insurance Company*

|  |  |
|---|---|
| LATOYA THOMPSON, | Hon. Madeline Cox Arelo, U.S.D.J. |
|  | Case No.: 2:18-cv-06092-MCA-JAD |
| Plaintiff, |  |
| v. | **DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO *L. CIV. R.* 56.1** |
| LIBERTY MUTUAL INSURANCE, |  |
| Defendant. |  |

Pursuant to Local Civil Rule 56.1(a), Defendant Liberty Mutual Insurance Company ("Liberty Mutual" or "the Company") hereby submits the following Statement of Undisputed Material Facts in support of its Motion for Summary Judgment:

**The Parties**

1. Liberty Mutual is a property and casualty insurer in the United States.

2. Plaintiff Latoya Thompson ("Plaintiff") worked at Liberty Mutual's Roseland office from April 7, 2008 through her termination on July 28, 2016. (Pl. Dep. Tr., 46:11-18; (Rygiel-Boyd Cert., Exh. 1.)[1]

---

[1] Throughout this Statement references to Plaintiff's Deposition will be cited as "Pl. Tr. [page:line number]." True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 1. Additionally, all referenced exhibits refer to the exhibits attached to the accompanying Certification of Jennifer Rygiel-Boyd ("Rygiel-Boyd Cert.").

3. Plaintiff filed this action on or about February 6, 2018 asserting claims of pregnancy discrimination, disability discrimination based upon pregnancy, and retaliation based upon pregnancy and disability. (Docket Entry No. 1-1, ¶¶ 303, 311, 319.)

**Liberty Mutual's Anti-Discrimination, EEO and Handbook Policies**

4. Liberty Mutual's Equal Employment Opportunity policy ("EEO Policy") provides that the Company will not tolerate discrimination on the basis of any protected characteristic, including pregnancy. (Rygiel-Boyd Cert., Exh. 2).

5. Plaintiff understood that Liberty Mutual expressed a commitment to providing equal employment opportunity to all, including the fact that it would not tolerate discrimination on the basis of any characteristic prohibited by federal, state or local law, including based on race, disability, pregnancy, or any other protected category. (Pl. Dep. Tr., 63:22-64:20).

6. Plaintiff also understood that she was an "at-will" employee whose employment could be terminated at any time and for any reason. (Pl. Dep. Tr., 64:21-65:6).

7. Finally, Plaintiff acknowledged that Liberty Mutual's Employee Handbook did not create a contract of employment between herself and Liberty Mutual. (Pl. Dep. Tr., 11-14).

**Liberty Mutual Hired Plaintiff on April 7, 2008 as a Claims Adjuster**

8. Prior to being hired, Plaintiff interviewed in-person with, *inter alia*, Michelle Skibinsky, Michael Squeo, Allison Rotsettis, and Edie McGinn. (Pl. Dep. Tr., 36:2-37:23).

9. Liberty Mutual hired Plaintiff as an Associate Claims Specialist on April 7, 2008 to work at its Roseland office. (Pl. Dep. Tr., 35:23-36:1; 42:18-24; 46:11-18).

10. As an Associate Claims Specialist, Plaintiff was assigned workers' compensation cases after the claims were reported to Liberty Mutual. She would direct treatment, pay lost wages and missing indemnity, and to try to resolve and settle the claim. (Pl. Dep. Tr., 42:23-43:7.)

**In 2013 Plaintiff's job performance begins to Deteriorate**

11. In 2013, Plaintiff failed to arrange for a response to a civil lawsuit on behalf of Liberty Mutual, resulting in Liberty Mutual being required to pay over $250,000. (Rygiel-Boyd Cert., Exh. 3, Pg. 2-3)

12. Edie McGinn, Plaintiff's direct supervisor, completed and provided Plaintiff with her Objective Setting and Performance Evaluation Form for 2013. (Pl. Dep. Tr.,160:5-161:3; McGinn Dep. Tr., 45:22-48:10; 50:24-51:24; Rygiel-Boyd Cert., Exh. 3.) [2]

13. According to Plaintiff, she was terminated because of a 2013 issue with a civil lawsuit that resulted in Liberty Mutual being required to pay over $250,000, which was discussed in Plaintiff's 2013 performance evaluation. (Pl. Dep. Tr., 171:23-174:25; 477:4-13; Rygiel-Boyd Cert., Exh. 3, Pgs. 2-3.)

**In 2014, Plaintiff's Job Performance Declines Precipitously**

14. Debra Holt became the Team Manager and Plaintiff's direct supervisor, on or about April 21, 2014. (McGinn Dep. Tr., 53:6-12; 54:18-20; 55:15-20; 62:13-15; Holt Dep. Tr., 22:25-23:1; 27:2-28:2; 60:8-17.)[3]

15. On May 28, 2014, Holt sent an email to Jenese Karlen, HR, requesting time to speak with her regarding a "new trend… with Latoya" (Rygiel-Boyd Cert., Exh. 4.)

---

[2] Throughout this Statement references to Edith McGinn's Deposition will be cited as "McGinn Dep. Tr. [page:line number]." True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 30.

[3] Throughout this Statement references to Debra Holt's Deposition will be cited as "Holt Dep. Tr. [page:line number]." True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 31.

16. Holt then had discussions regarding Plaintiff's performance issues with Michael Squeo, the Regional Claims Manager. (Squeo Dep. Tr., 28:14-29:4; 33:15-34:7; 35:9-12.)[4]

17. Based on those discussions, Squeo requested HR and his supervisor for permission to terminate Plaintiff. (Squeo Dep. Tr., 39:19-40:7.)

18. As Squeo noted in his July 24, 2014 e-mail, 136 of the 232 claims assigned to Plaintiff had not been touched in three months; "some of the new assignments were not reviewed within the 14 day requirement;" 20 cases had to be reassigned to another Technical Claims Specialist; and mail was founded on her desk untouched. (Rygiel-Boyd Cert., Exh. 5.)

19. With the approval of Squeo and HR, Holt issued a Written Warning to Plaintiff on August 13, 2014 ("First Warning"). (Pl. Dep. Tr., 264:18-265:16; Holt Dep. Tr., 87:7-14; Squeo Dep. Tr., 33:15-35:12; Rygiel-Boyd Cert., 6.)

20. Prior to issuing the First Warning, Holt met with Plaintiff on June 11, 2014 and June 24, 2014 to discuss these performance issues. (Pl. Dep. Tr., 266:5-267:6.)

21. As part of the First Warning, Plaintiff was to attend weekly coaching sessions with Holt to help improve her performance. (Pl. Dep. Tr., 272:13-23; 275:5-16; Holt Dep. Tr., 94:16-95:10.)

22. One of the areas on which Holt coached Plaintiff was email communications with her coworkers. (Pl. Dep. Tr., 276:11-17.)

23. Holt and Squeo discussed Plaintiff's performance issues on September 11, 2014. Holt acknowledged that Plaintiff's performance was "not getting worse" but was not "where she should be." (Rygiel-Boyd Cert., Exh. 7.)

---

[4] Throughout this Statement references to Michael Squeo's Deposition will be cited as "Squeo Dep. Tr. [page:line number]." True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 32.

24.     Consequently, Squeo agreed to extend the Written Warning for another 30 day period because Plaintiff did not "demonstrate the ability to consistently meet and maintain expectations in other areas," the Written Warning was extended for another 30 days on September 16, 2014 ("Second Warning"). (Pl. Dep. Tr., 299:19-301:8; Squeo Dep. Tr., 36:10-37:2; Rygiel-Boyd Cert., Exhs. 7 and 8.)

25.     Holt continued the weekly coaching sessions with Plaintiff. (Pl. Dep. Tr., 303:21-305:7.)

26.     On September 16, 2014, over 30 days after the Written Warning was issued to her, Plaintiff submitted a rebuttal to the Written Warning, which did not relate to Plaintiff's pregnancy. (Pl. Dep. Tr., 295:1-24; Rygiel-Boyd Cert., Exh. 9.)

27.     Holt, with the approval of Mr. Squeo and Jenese Karlen from Human Resources, removed Plaintiff from the written warning status effective October 14, 2014. (Pl. Dep. Tr., 306:15-25; Squeo Dep. Tr., 37:13-18; Rygiel-Boyd Cert., Exh. 10.)

**Plaintiff Disagrees with the 2014 Performance Assessment of Manager Debra Holt**

28.     Holt completed and provided Plaintiff with her Objective Setting and Performance Evaluation Form for 2014. (Pl. Dep. Tr., 187:16-188:11; Holt Dep. Tr., 75:15-22; 77:11-78:20; Rygiel-Boyd Cert., Exh. 11.)

29.     In the review, Holt credited Plaintiff with improving her work performance after being placed on a Written Warning. (Rygiel-Boyd Cert., Exh. 11.)

30.     Her overall performance rating was a 5 on a scale of 1 – 15 (with a 6 for results rating and a -1 for behaviors rating). (Rygiel-Boyd Cert., Exh. 11.)

31. When Holt met with Plaintiff in 2014 and explained to her that "that case … blew up," Plaintiff believes that "it was predetermined that [she] would be terminated." (Pl. Dep. Tr., 477:9-13.)

32. Plaintiff maintains that Liberty Mutual made the decision to terminate her in 2014. (Pl. Dep. Tr., 477:18-478:8.)

**Plaintiff's Contacts HR After Receiving Written Warning**

33. Just prior to submitting her rebuttal to the Written Warning on September 16, 2014, Plaintiff submitted a complaint to Human Resources alleging that Holt discriminated against her because of factors other than pregnancy. (Pl. Dep. Tr., 504:6-18; 507:12-20; Rygiel-Boyd Cert., Exh. 12.)

34. HR investigated Plaintiff's complaint, including interviewing Plaintiff. (Pl. Dep. Tr., 504:23-25; 506:1-12.)

35. Upon concluding its investigation, HR advised Plaintiff that they were unable to substantiate her allegations. (Pl. Dep. Tr., 506:13-507:11.)

**In 2015 and 2016, Plaintiff's Job Performance Continues to Decline**

36. On April 9, 2015, Michelle Skibinsky became Plaintiff's direct supervisor. (Pl. Dep. Tr., 311:12-17; Holt Dep. Tr., 70:7-13.)

37. Skibinsky issued a Verbal Warning to Plaintiff on June 10, 2015 ("Third Warning") because of the "quality of [her] claim handling and the management of [her] inbox." (Pl. Dep. Tr., 310:12-25; 311:6-11; 311:19-312:6; Rygiel-Boyd Cert., Exh. 13.)

38. Skibinsky then issued a Written Warning to Plaintiff on June 26, 2015 ("Fourth Warning"). (Pl. Dep. Tr., 344:3-23; Rygiel-Boyd Cert., Exh. 14.)

39. As part of the Written Warning, Plaintiff was to attend weekly coaching sessions with Skibinsky. (Pl. Dep. Tr., 346:14-347:2.)

40. Plaintiff also received a One Time Final Warning for violating the Company's internet usage policy. (Pl. Dep. Tr., 329:21-330:16; Rygiel-Boyd Cert., Exh. 15.)

41. Plaintiff admittedly used the internet for nonbusiness-related purposes while working at Liberty Mutual. (Pl. Dep. Tr., 331:4-14.)

42. On January 13, 2016, Skibinsky and Karlen held a job performance discussion with Plaintiff. (Pl. Dep. Tr., 381:16-22.)

43. The next day, January 14, 2016, Karlen sent a follow-up to email to Plaintiff regarding the behavioral issues and policy violations discussed ("Fifth Warning"). (Pl. Dep. Tr., 367:5-24; Rygiel-Boyd Cert., Exh. 16.)

44. Karlen also sent Plaintiff a follow-up email detailing her various performance issues. (Rygiel-Boyd Cert., Exh. 17.)

**Plaintiff Disagrees with the 2015 Performance Assessment of Manager Michelle Skibinsky**

45. Skibinsky completed and provided Plaintiff with her Objective Setting and Performance Evaluation Form for 2015. (Pl. Dep. Tr., 205:3-16; Rygiel-Boyd Cert., Exh. 18.)

46. Her overall performance rating was a 4 on a scale of 1 – 15 (with a 5 for results rating and a -1 for behaviors rating). (Rygiel-Boyd Cert., Exh. 18.)

47. Plaintiff disputed Ms. Skibinsky's assessment of her performance. (Rygiel-Boyd Cert., Exh. 18, Pgs. 8-9.)

**Plaintiff Contacts HR After Receiving Her 2015 Performance Evaluation**

48. Plaintiff submitted a complaint to HR on January 25, 2016, alleging that Skibinsky discriminated and harassed her because of factors other than pregnancy. (Pl. Dep. Tr., 530:3-23; Rygiel-Boyd Cert., Exh. 19.)

49. HR investigated this complaint. (Polk Dep. Tr., 28:2-25; 35:4-20; 41:19-45:8; 48:10-51:25.)[5]

50. Upon the conclusion of his investigation, Michael Polk, HR Manager, met with Plaintiff on May 16, 2016, and advised her that HR could not substantiate her allegations against Skibinsky. (Pl. Dep. Tr., 616:6-617:20; Polk Dep. Tr., 53:5-10; Rygiel-Boyd Cert., Exh. 20.)

**Plaintiff Notified Liberty Mutual of Her Pregnancy on May 13, 2016**

51. On May 13, 2016, Plaintiff sent an email to Skibinsky and Polk notifying them that she was pregnant. (Rygiel-Boyd Cert., Exh. 21.)

52. This email was the first time Plaintiff notified Liberty Mutual of her pregnancy. (Docket Entry No. 1-1,¶ 250.)

53. Skibinsky sent Plaintiff a congratulatory email in response, wishing her "a happy and health pregnancy" and subsequently referring to Plaintiff's announcement as "great news." (Rygiel-Boyd Cert., Exh. 21.)

**Plaintiff Receives Another Written Performance Warning**

54. Skibinsky issued a Written Warning to Plaintiff on May 26, 2016 ("Sixth and Final Warning"). (Pl. Dep. Tr., 390:22-391:19; 393:9-11; Rygiel-Boyd Cert., Exh. 22.)

---

[5] Throughout this Statement references to Michael Polk's Deposition will be cited as "Polk Dep. Tr. [page:line number]." True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 33.

55. Skibinsky made the recommendation to issue the Sixth and Final Warning, but she did not have the authority to issue it. (Skibinsky Dep. Tr. Vol. 2, 25:9-16.)[6]

56. Prior to issuing the Sixth and Final Warning and prior to Plaintiff's notification to Liberty Mutual that she was pregnant, Skibinsky met with Plaintiff on, at least, 13 occasions, to counsel and coach Plaintiff's performance issues. (Rygiel-Boyd Cert., Exh. 22.)

57. Plaintiff admitted that she does not know whether Skibinsky issued the Sixth and Final Warning because she was pregnant. (Pl. Dep. Tr., 408:1-11.)

58. Plaintiff admitted that she was not the only pregnant employee. Other employees were also pregnant at the time. (Pl. Dep. Tr., 408:7-10.)

59. Plaintiff admitted that Skibinsky did not say anything demeaning or derogatory to her regarding her pregnancy. (Pl. Dep. Tr., 408:12-17.)

60. Because Plaintiff's job performance did not "improve consistently to an acceptable level" after being issued the Sixth and Final Warning, Skibinsky placed Plaintiff on probation on June 27, 2016 for 30 days. (Pl. Dep. Tr., 415:7-416:11; DeBellis Dep. Tr., 79:24-80:16; Rygiel-Boyd Cert., Exh. 23.)[7]

61. Skibinsky did not have the authority to issue the probation. She could only make the recommendation to HR. (Skibinsky Dep. Tr. Vol. 2, 36:15-37:3; 38:6-8; 38:16-21.)

62. Plaintiff's probationary period ended on July 27, 2016. (Pl. Dep. Tr., 416:17-23; 440:8-15; 441:3-5; Rygiel-Boyd Cert., Exh. 23.)

---

[6] Throughout this Statement references to Michelle Skibinsky's Deposition will be cited as "Skibinsky Dep. Tr. [Volume:page:line number]." Ms. Skibinksy's married name is "Kalikovic". True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 34.

[7] Throughout this Statement references to Mary Ellen DeBellis' Deposition will be cited as "DeBellis Dep. Tr. [page:line number]." True and correct copies of the cited transcript pages are attached to the Rygiel-Boyd Cert. as Exhibit 35.

63. Plaintiff understood that her employment could be terminated if she failed to improve her job performance during the probationary period. (Pl. Dep. Tr., 417:20-24; 439:25-440:5.)

64. Plaintiff understood that, once her probationary period ended, Liberty Mutual would make a decision regarding her employment. (Pl. Dep. Tr., 441:6-9.)

65. On July 15, 2016, Plaintiff notified Liberty Mutual's HR Support Center that her maternity leave would begin on August 8, 2016. (Pl. Dep. Tr., 438:5-439:7; Rygiel-Boyd Cert., Exh. 24.)

66. On July 27, 2016, Plaintiff's doctor gave her a medical note placing her on maternity leave effective July 28, 2016, but Plaintiff never provided the updated accommodation request and supporting medical document to Liberty Mutual until July 29, 2016, two days after Plaintiff's 30 day probationary period ended. (Pl. Dep. Tr., 455:15-21; 465:23-24.)

67. Plaintiff never notified Skibinsky of the updated accommodation request. (Pl. Dep. Tr., 442:11-25; 444:2-4; 455:15-18.)

68. Plaintiff testified that she did not provide Liberty Mutual with a medical note from her doctor changing the start date of her maternity leave prior to her termination. (Pl. Dep. Tr., 455:15-21; 463:14-464:1.)

**Individuals other than Skibinsky made the decision to terminate Plaintiff's Employment**

69. After Plaintiff's probationary period expired, Skibinsky recommended that Plaintiff's employment be terminated due to her continued performance issues. (Skibinsky Dep. Tr. Vol. 2, 40:12-25; 41:11-42:19; Rygiel-Boyd Cert., Exh. 25.)

70. Tressa Schnippel, Employee Relations Specialist, supported the termination decision and requested Mary Ellen DeBellis's approval on July 27, 2016. (DeBellis Dep. Tr., 51:4-52:23; 81:20-82:15; 115:23-116:9; Rygiel-Boyd Cert., Exh. 25.)

71. In considering that recommendation, DeBellis reviewed Plaintiff's performance reviews and disciplinary notices. (DeBellis Dep. Tr., 52:2-7; 73:18-74:10; 117:2-13; Rygiel-Boyd Cert., Exh. 25.)

72. On July 27, 2016, DeBellis approved the termination, finding that the termination was appropriate. DeBellis was not aware of Plaintiff's pregnancy at this time. (DeBellis Dep. Tr., 65:5-66:3; 77:12-20; 91:10-14; 92:17-19; Rygiel-Boyd Cert., Exh. 26.)

73. Plaintiff went to work on July 28, 2016, the day after her probationary period ended. (Pl. Dep. Tr., 440:16-441:5.)

74. Skibinsky sent Plaintiff a message asking Plaintiff to come to her office. (Pl. Dep. Tr., 444:10-15.)

75. Plaintiff responded that she was on a telephone call with a customer and asked if she could stop by after the call. (Pl. Dep. Tr., 444:16-18.)

76. Skibinsky told Plaintiff that was fine and to meet her in the conference room. (Pl. Dep. Tr., 444:19-20.)

77. Plaintiff, however, never met Skibinsky in the conference room. (Pl. Dep. Tr., 444:21-445:18.)

78. Instead, she abruptly left work. (Pl. Dep. Tr., 444:21-446:10; Rygiel-Boyd Exh. 27.)

79. The next day, July 29, 2016, Plaintiff received a call from a Pennsylvania number at approximately 5:30 p.m. while she was out at a store (Pl. Dep. Tr., 452:3-11; 453:12-15.)

80. DeBellis, along with Tressa Schnippel, was calling Plaintiff to advise her of the Company's termination decision since DeBellis did not meet with Plaintiff on July 28. (DeBellis Dep. Tr., 54:4-55:6; 114:7-115:11.)[8]

81. After Plaintiff said hello, Ms. DeBellis began talking but the call dropped. (Pl. Dep. Tr., 452:12-16; 452:20-22.)

82. Plaintiff did not return the call because her phone died. (Pl. Dep. Tr.,452:17-19.)

83. Liberty Mutual sent a termination letter via FedEx overnight mail on August 1, 2016. (Rygiel-Boyd Cert., Exh. 28.)

84. Liberty Mutual's termination letter was delivered the next day on August 2, 2016 at 9:50 a.m. when FedEx left it at the front door to Plaintiff's house. (Pl. Dep. Tr., 485:14-18; Rygiel-Boyd Cert., Exh. 29.)

85. Plaintiff did not receive the letter until a week after it was delivered because she shares the front door with another apartment in her building. (Pl. Dep. Tr., 467:2-469:24; 472:8-18.)

86. After she received the package, Plaintiff waited approximately one to three months before she opened the FedEx overnight envelope. (Pl. Dep. Tr., 480:9-481:1.)

Dated: July 7, 2020                                  s/ Jennifer Rygiel-Boyd
                                                                 Steven J. Luckner

- 
- 
- 43399893.1

---

[8] Ms. DeBellis placed the call to Plaintiff because Ms. Hollis was on maternity leave at the time. (DeBellis Dep. Tr., 55:7-19.)