BRIAN M. CIGE
Attorney ID: 015671984
LAW OFFICES OF BRIAN M. CIGE
7 East High Street
Somerville, New Jersey 08876
Telephone: (908) 685-3775
Facsimile: (908) 685-2274
*Attorney for Plaintiff*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| LATOYA THOMPSON,<br><br>            Plaintiff,<br><br>vs.<br><br>LIBERTY MUTUAL INSURANCE,<br><br>            Defendant. | Hon. Madeline Cox Arleo, U.S.D.J.<br><br>Civ. Action No. 2:18-cv-06092-MCA-JAD<br><br>**PLAINTIFF'S *L. CIV. R.* 56.1 RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS and PLAINTIFF'S SUPPLEMENTAL STATEMENT OF DISUPUTED MATERIAL FACTS** |

Pursuant to Local Rule 56.1(a), Plaintiff hereafter addresses each paragraph in Movant's Statement indicating agreement or disagreement and citing to the record as necessary, noting in particular the wrongful characterization of its purported undisputed material facts, with conclusions to support its goal of dismissing Plaintiff's case, as well as descriptions inserted above responses which constitute argument. Plaintiff also provides a Supplemental Statement of Disputed Material Facts for the Court to consider pursuant to this Rule.

**PLAINTIFF'S *L. CIV. R.* 56.1 RESPONSE TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

The Parties

1. Liberty Mutual is a property and casualty insurer in the United States.

    **Agree.**

2.      Plaintiff Latoya Thompson ("Plaintiff") worked at Liberty Mutual's Roseland office from April 7, 2008 through her termination on July 28, 2016. (Pl. Dep. Tr., 46:11-18; (Rygiel-Boyd Cert., Exh. 1.)

**Agree as to Plaintiff's date of hire.  Disagree as to termination date, as set forth in Nos. 83-86 below.  Note that Plaintiff had begun her disability/medical leave for pregnancy prior to being informed, on or about 9 August 2016, that her employment was terminated.**

3.      Plaintiff filed this action on or about February 6, 2018 asserting claims of pregnancy discrimination, disability discrimination based upon pregnancy, and retaliation based upon pregnancy and disability. (Docket Entry No. 1-1, ¶¶ 303, 311, 319.)

**Agree.  Emphasize that all claims were pursuant to New Jersey State Law, specifically the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 et seq.**

<u>Liberty Mutual's Anti-Discrimination, EEO and Handbook Policies</u>

4.      Liberty Mutual's Equal Employment Opportunity policy ("EEO Policy") provides that the Company will not tolerate discrimination on the basis of any protected characteristic, including pregnancy. (Rygiel-Boyd Cert., Exh. 2).

**Agree.  That is what the EEO Policy states.  Plaintiff testified "Yes.  Per the document." (Thompson, P64, L20).  Plaintiff avers generally that it was not followed.**

5.      Plaintiff understood that Liberty Mutual expressed a commitment to providing equal employment opportunity to all, including the fact that it would not tolerate discrimination on the basis of any characteristic prohibited by federal, state or local law, including based on race, disability, pregnancy, or any other protected category. (Pl. Dep. Tr., 63:22-64:20).

**Agree.  That is what the EEO Policy states.  Plaintiff testified "Yes.  Per the document." (Thompson, P64, L20).  Plaintiff avers generally that it was not followed.**

6.      Plaintiff also understood that she was an "at-will" employee whose employment could be terminated at any time and for any reason. (Pl. Dep. Tr., 64:21-65:6).

**Agree. Plaintiff was an at-will employee.  Note that being so is not relevant to allegations of statutory claims as identified in No. 3 above.**

7. Finally, Plaintiff acknowledged that Liberty Mutual's Employee Handbook did not create a contract of employment between herself and Liberty Mutual. (Pl. Dep. Tr., 11-14).

**Agree.  Plaintiff acknowledged that Liberty Mutual's Employee Handbook did not create a contract of employment between herself and Defendant.  Note that being so is not relevant to allegations of statutory claims as identified in No. 3 above.**

<u>Liberty Mutual Hired Plaintiff on April 7, 2008 as a Claims Adjuster</u>

8. Prior to being hired, Plaintiff interviewed in-person with, *inter alia*, Michelle Skibinsky, Michael Squeo, Allison Rotsettis, and Edie McGinn. (Pl. Dep. Tr., 36:2-37:23).

**Agree.**

9. Liberty Mutual hired Plaintiff as an Associate Claims Specialist on April 7, 2008 to work at its Roseland office. (Pl. Dep. Tr., 35:23-36:1; 42:18-24; 46:11-18).

**Agree.**

10. As an Associate Claims Specialist, Plaintiff was assigned workers' compensation cases after the claims were reported to Liberty Mutual. She would direct treatment, pay lost wages and missing indemnity, and to try to resolve and settle the claim. (Pl. Dep. Tr., 42:23-43:7.)

**Agree.**

In 2013 Plaintiff's job performance *begins to Deteriorate*\*

**\*Inappropriate argument**

11. In 2013, Plaintiff failed to arrange for a response to a civil lawsuit on behalf of Liberty Mutual, resulting in Liberty Mutual being required to pay over $250,000. (Rygiel-Boyd Cert., Exh. 3, Pg. 2-3)

**Disagree.  Plaintiff denies this allegation.  She testified that this "blew up" while she was out on disability/medical leave and was unaware of it (Thompson, P171, L23 – P172, L17).**

12. Edie McGinn, Plaintiff's direct supervisor, completed and provided Plaintiff with her Objective Setting and Performance Evaluation Form for 2013. (Pl. Dep. Tr.,160:5-161:3; McGinn Dep. Tr., 45:22-48:10; 50:24-51:24; Rygiel-Boyd Cert., Exh. 3.)

**Agree it was completed.  Disagree it was provided to Plaintiff as she was out on a disability/medical leave of absence (Thompson, P160, L23-24).**

13.     According to Plaintiff, she was terminated because of a 2013 issue with a civil lawsuit that resulted in Liberty Mutual being required to pay over $250,000, which was discussed in Plaintiff's 2013 performance evaluation. (Pl. Dep. Tr., 171:23-174:25; 477:4-13; Rygiel-Boyd Cert., Exh. 3, Pgs. 2-3.)

**Disagree. Plaintiff testified that this was a purported reason for firing her at that time, she did nothing wrong, and the termination was not actually effected at this time. She testified that this "blew up" while she was out on disability/medical leave and was unaware of it (Thompson, P171, L23 – P172, L17).**

In 2014, Plaintiff's Job Performance *Declines Precipitously**

**\*Inappropriate argument**

14.     Debra Holt became the Team Manager and Plaintiff's direct supervisor, on or about April 21, 2014. (McGinn Dep. Tr., 53:6-12; 54:18-20; 55:15-20; 62:13-15; Holt Dep. Tr., 22:25-23:1; 27:2-28:2; 60:8-17.)

**Agree.**

15.     On May 28, 2014, Holt sent an email to Jenese Karlen, HR, requesting time to speak with her regarding a "new trend… with Latoya" (Rygiel-Boyd Cert., Exh. 4.)

**Agree.**

16.     Holt then had discussions regarding Plaintiff's performance issues with Michael Squeo, the Regional Claims Manager. (Squeo Dep. Tr., 28:14-29:4; 33:15-34:7; 35:9-12.)

**Agree that there were discussions.**

17.     Based on those discussions, Squeo requested HR and his supervisor for permission to terminate Plaintiff. (Squeo Dep. Tr., 39:19-40:7.)

**Agree**.

18. As Squeo noted in his July 24, 2014 e-mail, 136 of the 232 claims assigned to Plaintiff had not been touched in three months; "some of the new assignments were not reviewed within the 14 day requirement;" 20 cases had to be reassigned to another Technical Claims Specialist; and mail was founded on her desk untouched. (Rygiel-Boyd Cert., Exh. 5.)

**Agree that that is what the email referenced. Disagree that being behind on her work should have been held against her because she had been out on a disability/medical leave at that time (Thompson, P177, L12-18; P179, L5-L15; P190, L15 - P191, L18).**

19. With the approval of Squeo and HR, Holt issued a Written Warning to Plaintiff on August 13, 2014 ("First Warning"). (Pl. Dep. Tr., 264:18-265:16; Holt Dep. Tr., 87:7-14; Squeo Dep. Tr., 33:15-35:12; Rygiel-Boyd Cert., 6.)

**Agree that Holt issued a Written Warning. Disagree it was justified, as Plaintiff testified her case work backed up because she was on a disability/medical leave (Thompson, P266, L5-23).**

20. Prior to issuing the First Warning, Holt met with Plaintiff on June 11, 2014 and June 24, 2014 to discuss these performance issues. (Pl. Dep. Tr., 266:5-267:6.)

**Agree that Holt and Plaintiff met to discuss alleged performance issues. Disagree it was justified, as Plaintiff testified her case work backed up because she was on a disability/medical leave (Thompson, P266, L5-23).**

21. As part of the First Warning, Plaintiff was to attend weekly coaching sessions with Holt to help improve her performance. (Pl. Dep. Tr., 272:13-23; 275:5-16; Holt Dep. Tr., 94:16-95:10.)

**Agree.**

22. One of the areas on which Holt coached Plaintiff was email communications with her coworkers. (Pl. Dep. Tr., 276:11-17.)

**Agree.**

23. Holt and Squeo discussed Plaintiff's performance issues on September 11, 2014. Holt acknowledged that Plaintiff's performance was "not getting worse" but was not "where she should be." (Rygiel-Boyd Cert., Exh. 7.)

**Agree that Holt and Squeo discussed Plaintiff's alleged performance issues. Note they begrudgingly framed it as Plaintiff's performance was "not getting worse" rather than stating anything positive about her.**

24.     Consequently, Squeo agreed to extend the Written Warning for another 30 day period because Plaintiff did not "demonstrate the ability to consistently meet and maintain expectations in other areas," the Written Warning was extended for another 30 days on September 16, 2014 ("Second Warning"). (Pl. Dep. Tr., 299:19-301:8; Squeo Dep. Tr., 36:10-37:2; Rygiel-Boyd Cert., Exhs. 7 and 8.)

**Agree that the Written Warning was extended for thirty (30) days.  Disagree that it was necessary or that Plaintiff did not demonstrate the ability to meet her responsibilities.  Further, this extension did not constitute a "Second" Warning as characterized (Thompson, P303, L30 – P306, L6).**

25.     Holt continued the weekly coaching sessions with Plaintiff. (Pl. Dep. Tr., 303:21- 305:7.)

**Agree.**

26.     On September 16, 2014, over 30 days after the Written Warning was issued to her, Plaintiff submitted a rebuttal to the Written Warning, which did not relate to Plaintiff's pregnancy. (Pl. Dep. Tr., 295:1-24; Rygiel-Boyd Cert., Exh. 9.)

**Agree.  Plaintiff submitted a Rebuttal dated 16 September 2014 in an email from Plaintiff to Holt, copying Karlen at HR, which referenced her complaints about work that was left for her on return from her disability/medical leave and other harassment / discrimination associated with her returning from same (Exhibit F).**

27.     Holt, with the approval of Mr. Squeo and Jenese Karlen from Human Resources, removed Plaintiff from the written warning status effective October 14, 2014. (Pl. Dep. Tr., 306:15-25; Squeo Dep. Tr., 37:13-18; Rygiel-Boyd Cert., Exh. 10.)

**Agree.  Plaintiff was removed from Written Warning status having completed the requirements of it.**

<u>Plaintiff Disagrees with the 2014 Performance Assessment of Manager Debra Holt</u>

28.   Holt completed and provided Plaintiff with her Objective Setting and Performance Evaluation Form for 2014. (Pl. Dep. Tr., 187:16-188:11; Holt Dep. Tr., 75:15-22; 77:11-78:20; Rygiel-Boyd Cert., Exh. 11.)

**Agree.  The Evaluation Form was provided.**

29.  In the review, Holt credited Plaintiff with improving her work performance after being placed on a Written Warning. (Rygiel-Boyd Cert., Exh. 11.)

**Agree.**

30.  Her overall performance rating was a 5 on a scale of 1 – 15 (with a 6 for results rating and a -1 for behaviors rating). (Rygiel-Boyd Cert., Exh. 11.)

**Agree that this was the rating provided.  Note that Plaintiff maintains it was subjective and inaccurate, and that she was blocked from receiving performance ratings of co-employees from which to compare.**

31.  When Holt met with Plaintiff in 2014 and explained to her that "that case … blew up," Plaintiff believes that "it was predetermined that [she] would be terminated." (Pl. Dep. Tr., 477:9-13.)

**Agree.  See Answers to Nos. 11 and 13 above.**

32.  Plaintiff maintains that Liberty Mutual made the decision to terminate her in 2014. (Pl. Dep. Tr., 477:18-478:8.)

**Agree.  See answer to No. 13 above.**

<u>Plaintiff's Contacts HR After Receiving Written Warning*</u>

*****Plaintiff had previously *and* continuously complained to HR**

33.  Just prior to submitting her rebuttal to the Written Warning on September 16, 2014, Plaintiff submitted a complaint to Human Resources alleging that Holt discriminated against her because of factors other than pregnancy. (Pl. Dep. Tr., 504:6-18; 507:12-20; Rygiel-Boyd Cert., Exh. 12.)

**Agree.  Plaintiff filed a formal complaint with HR on 14 September 2014 (Exhibit G) (Thompson, P540, L6-18).**

34. HR investigated Plaintiff's complaint, including interviewing Plaintiff. (Pl. Dep. Tr., 504:23-25; 506:1-12.)

**Unable to Agree or Disagree. Plaintiff was told her complaint would be investigated (Thompson, P504, L23-25). Mr. Polk testified that he did (as set forth in Plaintiff's prior submission dated 17 January 2020, Exhibit Q), but Defendant maintained it was not an investigation and the Court concurred as a result of which no reports were provided during discovery (Exhibits P and R).**

35. Upon concluding its investigation, HR advised Plaintiff that they were unable to substantiate her allegations. (Pl. Dep. Tr., 506:13-507:11.)

**Unable to Agree or Disagree. Whether or not Mr. Polk concluded an investigation of discrimination, harassment and bullying by Ms. Skibinsky, he stated to Plaintiff that he could not substantiate her allegations. Disagree that he conducted a thorough investigation and actually *could not* substantiate her claims (Thompson, P617, L24 – P618, L14).**

In 2015 and 2016, Plaintiff's Job Performance *Continues to Decline**

**Inappropriate Characterization*

36. On April 9, 2015, Michelle Skibinsky became Plaintiff's direct supervisor. (Pl. Dep. Tr., 311:12-17; Holt Dep. Tr., 70:7-13.)

**Agree.**

37. Skibinsky issued a Verbal Warning to Plaintiff on June 10, 2015 ("Third Warning") because of the "quality of [her] claim handling and the management of [her] inbox." (Pl. Dep. Tr., 310:12-25; 311:6-11; 311:19-312:6; Rygiel-Boyd Cert., Exh. 13.)

**Agree. Plaintiff received a Verbal Warning. Disagree that it was justified as she was not informed prior that she did anything wrong (Thompson, P311, L21 – P312, L6). Further, this Warning should not be characterized as a "Third".**

38. Skibinsky then issued a Written Warning to Plaintiff on June 26, 2015 ("Fourth Warning"). (Pl. Dep. Tr., 344:3-23; Rygiel-Boyd Cert., Exh. 14.)

**Agree. Plaintiff received a Written Warning. Disagree it was justified as she informed that she wrote on it that her "signature is not agreement, solely compliance" (Thompson, P344, L19-23). Further, this Warning should not be characterized as a "Fourth".**

39. As part of the Written Warning, Plaintiff was to attend weekly coaching sessions with Skibinsky. (Pl. Dep. Tr., 346:14-347:2.)

**Agree.**

40. Plaintiff also received a One Time Final Warning for violating the Company's internet usage policy. (Pl. Dep. Tr., 329:21-330:16; Rygiel-Boyd Cert., Exh. 15.)

**Agreed. Plaintiff received a Warning for Violating Defendant's internet policy – on 26 June 2015, the same day as the Warning in No. 38 above. Disagree she should have received it as co-workers frequently accessed the internet at times during the work day (Thompson, P329, L21 – P332, L18).**

41. Plaintiff admittedly used the internet for nonbusiness-related purposes while working at Liberty Mutual. (Pl. Dep. Tr., 331:4-14.)

**Agree.**

42. On January 13, 2016, Skibinsky and Karlen held a job performance discussion with Plaintiff. (Pl. Dep. Tr., 381:16-22.)

**Agree.**

43. The next day, January 14, 2016, Karlen sent a follow-up to email to Plaintiff regarding the behavioral issues and policy violations discussed ("Fifth Warning"). (Pl. Dep. Tr., 367:5-24; Rygiel-Boyd Cert., Exh. 16.)

**Agree. Karlen sent Plaintiff an email. Disagree there were any actual behavioral issues as well. Further, this Warning should not be characterized as a "Fifth".**

44. Karlen also sent Plaintiff a follow-up email detailing her various performance issues. (Rygiel-Boyd Cert., Exh. 17.)

**Agree that the email was sent. Disagree it was justified.**

<u>Plaintiff Disagrees with the 2015 Performance Assessment of Manager Michelle Skibinsky</u>

45.     Skibinsky completed and provided Plaintiff with her Objective Setting and Performance Evaluation Form for 2015. (Pl. Dep. Tr., 205:3-16; Rygiel-Boyd Cert., Exh. 18.)

**Agree.**

46.     Her overall performance rating was a 4 on a scale of 1 – 15 (with a 5 for results rating and a -1 for behaviors rating). (Rygiel-Boyd Cert., Exh. 18.)

**Agree.  That is what it says but dispute accuracy of subjective ratings.  Note that Plaintiff maintains it was subjective and inaccurate, and that she was blocked from receiving performance ratings of co-employees from which to compare.**

47.     Plaintiff disputed Ms. Skibinsky's assessment of her performance. (Rygiel-Boyd Cert., Exh. 18, Pgs. 8-9.)

**Agree.**

<u>Plaintiff Contacts HR After Receiving Her 2015 Performance Evaluation*</u>

**\* Plaintiff had previously *and* continuously complained to HR**

48.     Plaintiff submitted a complaint to HR on January 25, 2016, alleging that Skibinsky discriminated and harassed her because of factors other than pregnancy. (Pl. Dep. Tr., 530:3-23; Rygiel-Boyd Cert., Exh. 19.)

**Agree Plaintiff submitted a complaint to HR on 25 January 2016.  Disagree that her complaints were limited to "factors other than pregnancy". The complaint speaks for itself. (Exhibit K).**

49.     HR investigated this complaint. (Polk Dep. Tr., 28:2-25; 35:4-20; 41:19-45:8; 48:10-51:25.)

**Unable to Agree or Disagree.  Plaintiff was told her complaint would be investigated (Thompson, P504, L23-25).  Mr. Polk testified that he did (as set forth in Plaintiff's prior submission dated 17 January 2020, Exhibit Q) but Defendant maintained it was not an investigation and the Court concurred as a result of which no reports were provided during discovery (Exhibits P and R)**

50. Upon the conclusion of his investigation, Michael Polk, HR Manager, met with Plaintiff on May 16, 2016, and advised her that HR could not substantiate her allegations against Skibinsky. (Pl. Dep. Tr., 616:6-617:20; Polk Dep. Tr., 53:5-10; Rygiel-Boyd Cert., Exh. 20.)

**Agree. Whether or not Mr. Polk concluded an investigation of discrimination, harassment and bullying by Ms. Skibinsky, he stated to Plaintiff that he could not substantiate her allegations. Disagree that he conducted a thorough investigation and actually *could not* substantiate her claims (Thompson, P617, L24 – P618, L14).**

Plaintiff Notified Liberty Mutual of Her Pregnancy on May 13, 2016

51. On May 13, 2016, Plaintiff sent an email to Skibinsky and Polk notifying them that she was pregnant. (Rygiel-Boyd Cert., Exh. 21.)

**Agree.**

52. This email was the first time Plaintiff notified Liberty Mutual of her pregnancy. (Docket Entry No. 1-1,¶ 250.)

**Agree. This was the first "official" notification. Disagree that Plaintiff's Supervisors were not made aware previously.**

53. Skibinsky sent Plaintiff a congratulatory email in response, wishing her "a happy and health pregnancy" and subsequently referring to Plaintiff's announcement as "great news." (Rygiel-Boyd Cert., Exh. 21.)

**Agree.**

Plaintiff Receives Another Written Performance Warning*

*Object to the word "Another"

54. Skibinsky issued a Written Warning to Plaintiff on May 26, 2016 ("Sixth and Final Warning"). (Pl. Dep. Tr., 390:22-391:19; 393:9-11; Rygiel-Boyd Cert., Exh. 22.)

**Agree. Plaintiff received a Written Warning on 26 May 2016 about two (2) weeks after her giving official notification that she was pregnant. Disagree that it was because of her job performance, was only told she "needed to work faster", which she always did (Thompson, P395, L13-19; P397, L6-24). Further, this Warning should not be characterized as a "Sixth".**

55.     Skibinsky made the recommendation to issue the Sixth and Final Warning, but she did not have the authority to issue it. (Skibinsky Dep. Tr. Vol. 2, 25:9-16.)

**Agree.  Note that Skibinsky gave partial, incomplete and false information to her Supervisors to make the case for adverse employment actions against Plaintiff.   Further, this Warning should not be characterized as a "Sixth".**

56.     Prior to issuing the Sixth and Final Warning and prior to Plaintiff's notification to Liberty Mutual that she was pregnant, Skibinsky met with Plaintiff on, at least, 13 occasions, to counsel and coach Plaintiff's performance issues. (Rygiel-Boyd Cert., Exh. 22.)

**Agree that Plaintiff met with Skibinsky on many occasions for "coaching".  Disagree that there were real performance issues.  Further, this Warning should not be characterized as a "Sixth".**

57.     Plaintiff admitted that she does not know whether Skibinsky issued the Sixth and Final Warning because she was pregnant. (Pl. Dep. Tr., 408:1-11.)

**Agree.  Plaintiff did not know what was in the mind of Skibinsky but did understand she was being subjected to a hostile work environment, due to the complaints filed against Skibinsky for harassment and discrimination which resulted in retaliation against Plaintiff (Thompson, P408, L12-19).**

58.     Plaintiff admitted that she was not the only pregnant employee. Other employees were also pregnant at the time. (Pl. Dep. Tr., 408:7-10.)

**Agree.  Note that Plaintiff, as contrasted with other employees, filed formal complaints of harassment and discrimination which resulted in retaliation (Thompson, P408, L12-19).**

59.     Plaintiff admitted that Skibinsky did not say anything demeaning or derogatory to her regarding her pregnancy. (Pl. Dep. Tr., 408:12-17.)

**Agree.**

60.     Because Plaintiff's job performance did not "improve consistently to an acceptable level" after being issued the Sixth and Final Warning, Skibinsky placed Plaintiff on probation on June 27, 2016 for 30 days. (Pl. Dep. Tr., 415:7-416:11; DeBellis Dep. Tr., 79:24-80:16; Rygiel-Boyd Cert., Exh. 23.)

**Disagree.  Whatever "improved consistently to an acceptable level" means, there was no actual factual basis to place Plaintiff on probation for thirty (30) days beginning on June 27, 2016.  Disagree it was justified as she wrote on it that her "signature is not agreement, solely compliance" (Thompson, P416, L3-16).  Further, this Warning should not be characterized**

**as a "Sixth".**

61. Skibinsky did not have the authority to issue the probation. She could only make the recommendation to HR. (Skibinsky Dep. Tr. Vol. 2, 36:15-37:3; 38:6-8; 38:16-21.)

**Agree. Note that Skibinsky gave partial, incomplete and false information to her Supervisors to make the case for adverse employment actions against Plaintiff.**

62. Plaintiff's probationary period ended on July 27, 2016. (Pl. Dep. Tr., 416:17-23; 440:8-15; 441:3-5; Rygiel-Boyd Cert., Exh. 23.)

**Agree.**

63. Plaintiff understood that her employment could be terminated if she failed to improve her job performance during the probationary period. (Pl. Dep. Tr., 417:20-24; 439:25-440:5.)

**Agree. Note that being so is not relevant to allegations of statutory claims as identified in No. 3 above.**

64. Plaintiff understood that, once her probationary period ended, Liberty Mutual would make a decision regarding her employment. (Pl. Dep. Tr., 441:6-9.)

**Agree.**

65. On July 15, 2016, Plaintiff notified Liberty Mutual's HR Support Center that her maternity leave would begin on August 8, 2016. (Pl. Dep. Tr., 438:5-439:7; Rygiel-Boyd Cert., Exh. 24.)

**Agree. Plaintiff, however, because of medical complications, Plaintiff's saw her doctor on the night of the 27 July 2016 and he put her out of work as of 28 July 2016 (Thompson, P442, L15-19).**

66. On July 27, 2016, Plaintiff's doctor gave her a medical note placing her on maternity leave effective July 28, 2016, but Plaintiff never provided the updated accommodation request and supporting medical document to Liberty Mutual until July 29, 2016, two days after Plaintiff's 30 day probationary period ended. (Pl. Dep. Tr., 455:15-21; 465:23-24.)

**Agree. Note Plaintiff did not have a chance to give it to Skibinsky, she started having cramps, called her doctor and informed her Supervisor that she needed to leave immediately. (Thompson, P442, L10 – P446, L19).**

67.     Plaintiff never notified Skibinsky of the updated accommodation request. (Pl. Dep. Tr., 442:11-25; 444:2-4; 455:15-18.)

**Agree.**

68.     Plaintiff testified that she did not provide Liberty Mutual with a medical note from her doctor changing the start date of her maternity leave prior to her termination. (Pl. Dep. Tr., 455:15-21; 463:14-464:1.)

**Agree.  Note it was due to medical reasons.  See answer to No. 66.**

<u>Individuals other than Skibinsky made the decision to terminate Plaintiff's Employment*</u>

***Decision was caused by Skibinsky**

69.     After Plaintiff's probationary period expired, Skibinsky recommended that Plaintiff's employment be terminated due to her continued performance issues. (Skibinsky Dep. Tr. Vol. 2, 40:12-25; 41:11-42:19; Rygiel-Boyd Cert., Exh. 25.)

**Agree in part.  Skibinsky recommended Plaintiff's employment be terminated before and at this time.  Disagree there were continuing performance issues.**

70.     Tressa Schnippel, Employee Relations Specialist, supported the termination decision and requested Mary Ellen DeBellis's approval on July 27, 2016. (DeBellis Dep. Tr., 51:4- 52:23; 81:20-82:15; 115:23-116:9; Rygiel-Boyd Cert., Exh. 25.)

**Agree.  Schnippel supported the termination decision recommended by Skibinsky, based on documents Skibinsky provided to her.**

71.     In considering that recommendation, DeBellis reviewed Plaintiff's performance reviews and disciplinary notices. (DeBellis Dep. Tr., 52:2-7; 73:18-74:10; 117:2-13; Rygiel-Boyd Cert., Exh. 25.)

**Disagree.  DeBellis testified she did not review Plaintiff's entire Personnel file and was not aware of Mr. Polk's involvement in the investigation, that Ms. Skibinsky was the subject of the complaints and was the one who recommended Plaintiff's termination.  (DeBellis, P74, L 11 – P76, L6)**

72.     On July 27, 2016, DeBellis approved the termination, finding that the termination was appropriate. DeBellis was not aware of Plaintiff's pregnancy at this time. (DeBellis Dep. Tr., 65:5-66:3; 77:12-20; 91:10-14; 92:17-19; Rygiel-Boyd Cert., Exh. 26.)

**Agree. That is what DeBellis testified to. Note this was based on Skibinsky's recommendation and Skibinsky was aware of Plaintiff's pregnancy at that time. See answer to No. 65.**

73. Plaintiff went to work on July 28, 2016, the day after her probationary period ended. (Pl. Dep. Tr., 440:16-441:5.)

**Agree.**

74. Skibinsky sent Plaintiff a message asking Plaintiff to come to her office. (Pl. Dep. Tr., 444:10-15.)

**Agree.**

75. Plaintiff responded that she was on a telephone call with a customer and asked if she could stop by after the call. (Pl. Dep. Tr., 444:16-18.)

**Agree.**

76. Skibinsky told Plaintiff that was fine and to meet her in the conference room. (Pl. Dep. Tr., 444:19-20.)

**Agree.**

77. Plaintiff, however, never met Skibinsky in the conference room. (Pl. Dep. Tr.,444:21-445:18.)

**Agree. Note that Plaintiff had a medical emergency and left early to go to the doctor. See answer to No. 66.**

78. Instead, she abruptly left work. (Pl. Dep. Tr., 444:21-446:10; Rygiel-Boyd Exh. 27.)

**Agree.**

79. The next day, July 29, 2016, Plaintiff received a call from a Pennsylvania number at approximately 5:30 p.m. while she was out at a store (Pl. Dep. Tr., 452:3-11; 453:12-15.)

**Agree. Note Plaintiff did not know who was calling her at that time or why (Thompson, P452, L6-11).**

80. DeBellis, along with Tressa Schnippel, was calling Plaintiff to advise her of the Company's termination decision since DeBellis did not meet with Plaintiff on July 28. (DeBellis Dep. Tr., 54:4-55:6; 114:7-115:11.)8

**Unaware. Note Plaintiff was on disability leave beginning A.M. on 29 July 2016 (Thompson, P475, L2-7).**

81. After Plaintiff said hello, Ms. DeBellis began talking but the call dropped. (Pl. Dep. Tr., 452:12-16; 452:20-22.)

**Agree. Note Plaintiff did not know who was calling her at that time or why (P452, L6-11).**

82. Plaintiff did not return the call because her phone died. (Pl. Dep. Tr.,452:17-19.)

**Agree.**

83. Liberty Mutual sent a termination letter via FedEx overnight mail on August 1, 2016. (Rygiel-Boyd Cert., Exh. 28.)

**Unaware. Plaintiff did not receive it  (Thompson. P467, L2-7; P468, L2-4).**

84. Liberty Mutual's termination letter was delivered the next day on August 2, 2016 at 9:50 a.m. when FedEx left it at the front door to Plaintiff's house. (Pl. Dep. Tr., 485:14-18; Rygiel-Boyd Cert., Exh. 29.)

**Unaware. Plaintiff did not receive it then (Thompson. P467, L2-7; P468, L2-4).**

85. Plaintiff did not receive the letter until a week after it was delivered because she shares the front door with another apartment in her building. (Pl. Dep. Tr., 467:2-469:24; 472:8- 18.)

**Agree. Plaintiff did not receive formal notification of the termination of her employment until on or about 8 August 2016 (Thompson. P472, L15-22).**

86. After she received the package, Plaintiff waited approximately one to three months before she opened the FedEx overnight envelope. (Pl. Dep. Tr., 480:9-481:1.)

**Agree in part. Plaintiff was about to give birth and was on disability / maternity leave at that time. It was not her priority. She did not open it for possibly one month, not three as alleged. She was busy having a baby (Thompson. P480, L13-22).**

**PLAINTIFF'S SUPPLEMENTAL STATEMENT OF DISUPUTED MATERIAL FACTS**

      An overview of Defendant's recitation of [alleged] Undisputed Material Facts makes clear that it is characterizing Plaintiff as an underperformer who was terminated for performance reasons.  The responses make clear that she objected continuously to there being any cause for disciplinary action and the eventual termination of her employment.  Glaringly, Defendant does not provide, because it would highlight the disputed nature of its assertion that the "facts as set forth are undisputed", the contemporaneous and detailed objections by Plaintiff to her being disciplined, harassed and discriminated against formally and by way of rebuttals to performance evaluation, focusing on the disability / medical leave she was on, her job performance being evaluated as if she was not absent from work, and not mentioning that her Supervisor was evaluating her performance after being aware that formal complaints had been made against Ms. Holt and then Ms. Skibinsky.

1. Where is Defendant's detailed reference to Plaintiff's 16 September 2014 Rebuttal to her 2014 Performance Evaluation which complained of disability discrimination? (Exhibit F)

2. Where is Defendant's reference to Plaintiff's formal complaint against Ms. Holt dated 16 September 2014 for harassment and disability discrimination. (Exhibit G)

3. Where is Defendant's reference to Plaintiff's formal complaint against Ms. Skibinsky dated 25 January 2016 for harassment and discrimination which complained of harassment, and discrimination, hostile work environment and bullying?  (Exhibit K)

4. Where is Defendant's reference to Plaintiff filing an EEOC Complaint on 9 May 2016 against Defendant which complained of harassment, disability discrimination and stress? (Exhibit J)

5. Where is Defendant's reference to the emails dated 13 July 2016 and its 25 July 2016 which foreshadowed the termination of Plaintiff's employment as its goal before it was communicated?  (Exhibits L and N)

6.  Significantly, Ms. DeBellis, who had the authority to actually terminate Plaintiff's employment, was unclear when she was aware of formal complaints by Plaintiff against Ms. Holt and then Ms. Skibinsky, and what impact this had on the decision making process when authorizing the firing of Plaintiff (DeBellis, P74, L14 – P75, L-9).  She testified that she was "informed by counsel" and it was reasonable to conclude counsel was not involved before litigation and so she did not know that information during the relevant time.

7. Where is Defendant's reference to the email dated 28 July 2016 regarding what was to be said at the exit interview, and noting that if Plaintiff brought up that her leave of absence for short-term disability (STD) had begun, the termination was not to be communicated at that time? (Exhibit O)

Defendant omitted all of these Exhibits, which separately, or taken together, support the serious allegation of retaliation plead in the Complaint, a violation of NJSA. 10:5-12(d) raising genuine issues of material fact as to whether she was disciplined to create a paper trail to justify the termination of Plaintiff's employment, motivated by her complaints.

Dated:  4 August 2020                                 *Brian M. Cige, Esq.*
                                                                            BRIAN M. CIGE, ESQ.