THOMPSON - Direct

```
 1            MR. LUCKNER:  Do you want her to hand
 2   the used exhibits to you or do you want her to just
 3   put them --
 4       Q.   Okay.  Just so you don't wind up with a
 5   whole stack of papers in front of you, just put the
 6   ones we've already used, just kind of put them here
 7   in the middle.
 8       A.   Oh, okay.
 9       Q.   Okay.  I'm showing you what's been marked
10   as D-3 for Identification.
11            Have you ever seen this document before?
12       A.   Yes, it looks familiar.
13       Q.   Okay.  So you were aware that Liberty
14   Mutual had an equal employment opportunity policy?
15       A.   Yes.
16       Q.   Okay.  And you were aware that stated that
17   Liberty Mutual did not tolerate discrimination based
18   on race, disability, pregnancy or any other
19   protected category?
20       A.   Yes.  Per the document.
21       Q.   Okay.  And at the bottom of this policy
22   beneath the line it says, The Employee Handbook does
23   not alter the at-will nature of your employment,
24   and the policies that it contains should not be
25   construed to create a contract of any kind.
```

THOMPSON-Direct

1   Evaluation, 1/1/13 - 12/31/13, Bates Nos. D-0056

2   thru D-0061 is received and marked D-17 for

3   Identification.)

4   BY MR. LUCKNER:

5       Q.   Okay.  I show you what's been marked as

6   D-17 for Identification.  It is approximately six

7   pages, labeled D-0056 through D-0061.  It's

8   entitled 2013 Objective Setting and Performance

9   Evaluation.

10           Have you ever seen this document before?

11      A.   Yes.

12      Q.   Okay.  And can you tell me what this

13  document is?

14      A.   Uhm, this is usually what they come up

15  with -- this is the goals or framework of what

16  they're working on with the employee for the next

17  -- or for the year, the current year.

18      Q.   Okay.  So it's got -- it's called the

19  same thing as the prior ones, right, it's an OSPE,

20  an Objective Setting Performance Evaluation?

21           Okay.  And is this your annual review for

22  the year 2013?

23      A.   Yes.  But I did not see this.  I was not

24  at work.

25      Q.   Okay.  And it's for the period January 1,

THOMPSON-Direct

1    four it's got a -- the development activity of

2    Meet total settlement goal of 10.

3              Do you see that?

4         A.   Yes.

5         Q.   Okay.  And then in the Results it says,

6    Latoya has not met the monthly settlement goal with

7    an average of 8.5 settlements per month.  She is

8    also short on her closure goal with an average of

9    15.5 closures per month.

10             And I guess the goal was 20.  Do you see

11   that?

12        A.   Yes, I see that.

13        Q.   Okay.  Is that accurate for 2013?

14        A.   Yes, because I wasn't there the whole

15   year.

16        Q.   Well, it's based on months so --

17   correct?  It was your average per month.

18             Do you think that they divided it by all

19   the months of the year?

20        A.   That I cannot definitively say, but I

21   -- based on this it would be incorrect.  Or it would

22   mean that everybody else didn't meet the quota,

23   because I had the highest disposition in the team.

24        Q.   Okay.  So it's your understanding that

25   nobody else met the quota if you didn't meet the

THOMPSON-Direct

1    the page.  There's a section called Areas of

2    Concern.

3            Do you see that?

4        A.   Yes.

5        Q.   And there is a -- it states, As we

6    discussed previously on 6/11/14, you failed to

7    post two resolution strategies within the 14 days.

8    On 6/24/14 we discussed your inbox.  On that

9    particular day you had 117 activities due.

10           Do you recall discussing this with your

11   manager at the time?

12       A.   Yes.  And Armando was there.

13       Q.   Okay.  So you, Debra Holt, and Armando

14   were there.

15       A.   Yes.  She came over to my desk.  I had

16   -- I had started accumulating my cases 'cause I was

17   out on disability and I came back April.  Right?

18   So she became the manager in May.  And prior what I

19   did, I managed my case on a rolling basis.  So even

20   though I had a hundred and something, I may have

21   zero the next day.  It didn't matter, because

22   whatever I got to, I got it to.  And I get to every

23   single case.  So it was on a rolling basis.

24           I spoke with Debra Holt and Armando.

25   And they suggested that instead of it looking so

THOMPSON-Direct

1   people aren't audited while they're out.  I was

2   given a really bad score.  I wasn't there to

3   advocate for myself.  And going back to me saying

4   that the QA is not really an impartial scoring

5   system because the person knows who they're scoring.

6   And many people complain of the biases.

7         Q.   The QA scores, aren't there checks?

8         A.   Randomly.  They'll pull one or two for

9   second level, which Michelle Skibinsky's unit

10  would do.

11        Q.   So there are checks on some of these QA

12  scores; correct?

13        A.   Randomly.

14        Q.   To make sure they're being done correctly?

15             Do you know how randomly they're done?

16        A.   Uhm, sometimes -- I don't know

17  collectively, but I know for a case manager you

18  might have one that may be randomly second checked

19  by a QA person.  And sometimes you don't have any

20  'cause somebody else has it, so it's very random.

21        Q.   Okay.  And part of the expectations over

22  the next 30 days was that you were gonna continue

23  to do weekly coaching sessions with Debra Holt?

24        A.   Yes.

25        Q.   Is that correct?

THOMPSON - Direct

```
 1              MR. CIGE:  Okay.

 2              MR. LUCKNER:  Okay.  There's 27.

 3              (Memo dated June 26, 2015 to Latoya

 4    Thompson from Michelle Skibinsky, Bates No.

 5    D-0160 thru D-0162 is received and marked D-27

 6    for Identification.)

 7              THE WITNESS:  Thank you.

 8    BY MR. LUCKNER:

 9        Q.   Okay.  I show you what's been marked as

10    D-27 for Identification.  Consists of three pages.

11    They are labeled D-0160 to D-0162.

12              Have you ever seen this document before?

13        A.   Yes.

14        Q.   Okay.  And what is this document?

15        A.   Job Performance - Written Warning.

16        Q.   Okay.  And on the last page, is that your

17    signature?

18        A.   Yes.

19        Q.   Okay.  And what does it say in handwriting

20    next to it, just for the record?

21              I think I can read it, but ...

22        A.   Oh, God.  Basically, the signature is not

23    agreement, solely compliance.

24        Q.   Okay.  That's what I thought it said.  I

25    just wanted to make sure.
```

THOMPSON - Direct

1    Q.   Okay.  And do you -- do you believe that
2    she was mad about your pregnancy?
3    A.   It's possible.
4    Q.   Well, anything's possible.
5         Do you have any reason to believe that
6    she was mad about your pregnancy?
7    A.   Lauren Sanseverino, who I was told I was
8    being disrespected for celebrating, she was also
9    pregnant at the time.  And there were a couple of
10   other pregnant people in the office, so, you
11   know -- I don't know.
12   Q.   Did she say anything to you when you told
13   her that you were pregnant that would make you think
14   that she was mad about you being pregnant?
15   A.   It was the treatment that I received.  She
16   did not say anything to me directly, except for an
17   e-mail, something about my date of going out,
18   inquiring about that.  That was it.  And this was
19   before this write-up.
20   Q.   Did she send you any congratulations when
21   you announced it?
22   A.   She sent an e-mail.  I don't recall the
23   exact words that she used in it, but she was
24   inquiring about my date of departure.
25   Q.   Okay.  And with regard to this written

THOMPSON-Direct

```
1    to your signature?
2         A.   Yes.
3         Q.   Okay.  Can you tell me just what the
4    handwriting says?
5         A.   Signature for compliance only not
6    agreement.  Rebuttal to follow.
7         Q.   Okay.  And when you received this
8    document on June 27, 2016, was it your understanding
9    that your job performance needed to improve in the
10   identified areas?
11        A.   Yes.  As stipulated by Michelle
12   Skibinsky.
13        Q.   Okay.  And did you agree --
14        A.   No.
15        Q.   -- with anything that was in this memo?
16        A.   No.
17        Q.   Okay.  And on the third page it says
18   that the written warning would last for 30 days;
19   is that correct?
20        A.   Yes.
21        Q.   Okay.  Actually, this is probation would
22   be for 30 days; correct?
23        A.   Right.
24        Q.   Okay.  Had you ever been on probation
25   before?
```

THOMPSON-Direct

```
 1   now, so ...

 2        Q.   Okay.

 3        A.   But it was in the morning.

 4        Q.   Is it between -- before 10:00 o'clock?

 5        A.   Usually.  I think so.

 6        Q.   Okay.  And you had -- you said you had

 7   come to give in your note that day --

 8        A.   Yes.

 9        Q.   -- with regard to going out?

10        A.   Because I was taken out of work.

11        Q.   Okay.  So you already had your doctor's

12   note --

13        A.   Yes.

14        Q.   -- on the 28th?

15             And when did you get the note from your

16   doctor putting you out as of the 28th?

17        A.   The night before.

18        Q.   Okay.  So the night of the 27th?

19        A.   Yes.

20        Q.   And that was the last day of your

21   probation period; right?

22        A.   Yes.

23        Q.   And did you give Michelle the note at the

24   huddle?

25        A.   No, I -- I -- I didn't get a chance to
```

THOMPSON-Direct

1    in the office, that she holds a rank higher than

2    our office.

3         Q.   Okay.  And on July 29 at about 5:30 p.m.,

4    you received a call from Maryellen Debellis;

5    correct?

6         A.   I don't know who was on the phone.  A

7    call came in from a Pennsylvania number.

8         Q.   Okay.  How'd you know it was Pennsylvania

9    number, just from the area code?

10        A.   I have family that lives in Pennsylvania.

11   So 610 I believe it was.

12        Q.   Okay.  And did you speak with

13   Ms. Debellis?

14        A.   I -- I said, Hello.  And the person was

15   talking and the call dropped, so I didn't speak to

16   the person.

17        Q.   Okay.  Did you try to call the person

18   back?

19        A.   My phone died.

20        Q.   Okay.  Well, did the call drop or did

21   your phone die?

22        A.   The call dropped.  Base -- I don't recall

23   the specifics of it.  But my phone was dead and I

24   was out in a store.  And once I powered up, I tried

25   to check my voice mail.  There was no voice mails

THOMPSON-Direct

```
 1   for Identification.)

 2              (Pause.)

 3              MR. CIGE:  I'm going to -- can you just

 4   open that door?

 5              (Pause.)

 6              THE WITNESS:  Thank you.

 7   BY MR. LUCKNER:

 8        Q.   Okay.  I show you what's been marked as

 9   Exhibit D-36 for Identification.  It consists of

10   two pages labeled D-0218 and D-0219.  It is a

11   letter addressed to you dated August 1, 2016.  And

12   it is from Maryellen Debellis.

13              Do you see this?

14        A.   Yes.

15        Q.   Okay.  And it was your testimony that

16   you received this document approximately a week

17   maybe, at least after it's dated?

18        A.   Yes.  I -- I -- I am not sure if I got

19   an e-mail of this prior to getting the physical.

20   'Cause I -- I said I'd been in contact with the

21   Human Resources Department when I found out about

22   the benefits.

23              And then I had to, I think, speak to

24   Tressa Schnippel, or something like that, so ...

25        Q.   Okay.
```

THOMPSON-Direct

```
 1   also a factor?
 2        A.   Yes.  'Cause I was supposed to be going
 3   out on disability.
 4             Actually, I was technically on FMLA leave
 5   as of the 29th in the morning.  So it's weird that
 6   they're calling me in the evening to terminate me
 7   when I'm already on maternity leave.
 8        Q.   Okay.  Had you provided the documentation
 9   yet to Liberty Mutual --
10        A.   I did --
11        Q.   -- on the 29th?
12        A.   I did.  I did.  I sent Liberty Mutual --
13   everything that I needed to do at that time was
14   presented, and they confirmed it via e-mail.
15             You had referenced a document from July
16   that they sent me with instructions.  I did
17   everything they told me to do at that point and
18   notified them that I was officially on maternity
19   leave.
20        Q.   Okay.  But that said that you were going
21   out on August 8, those documents that we reviewed
22   earlier --
23        A.   Right.
24        Q.   -- correct?
25        A.   And so when I called them at 8:00 o'clock
```

THOMPSON-Direct

```
 1    e-mail.

 2              I do think I reviewed her e-mail before

 3    opening that packet, but it's been so long, I can't

 4    give you, like, I did it at this day and this --

 5    like, I can't give you the specific details.  But I

 6    did review the e-mail that she sent and I did see it

 7    then.  And subsequently, I believe I reviewed the --

 8    the packet that I got later.

 9         Q.   Okay.  How long from between the time you

10    received -- you actually received the packet 'til

11    when you actually looked at what was in the packet,

12    how much time passed?

13         A.   I don't know.  I was preparing to have a

14    baby.  And I was also told to keep my stress level

15    down, so my focus at that point was preservation

16    for myself and my unborn child.

17         Q.   Okay.  So is it possible that you didn't

18    open that package for a month?

19         A.   It could be possible.

20         Q.   Okay.  Is it possible you didn't open it

21    for three months?

22         A.   No.  It would've been sooner than that.

23         Q.   Okay.  So somewhere between one and three

24    months is possible you may have waited to open the

25    overnight package?
```

THOMPSON-Direct

1    names or...

2        A.   No.

3        Q.   Okay.  All right.

4            MR. LUCKNER:  So let's start.  This is

5    37.

6            (E-mail sent 9/14/14 to Jenese Karlen

7    from Latoya Thompson, Bates No. LIB ESI 0244 is

8    received and marked D-37 for Identification.)

9    BY MR. LUCKNER:

10       Q.   Okay, Ms. Thompson, I show you what

11   we've marked as D-37 for Identification.

12           Can you take a look at that document and

13   tell me if you've ever seen it before.

14       A.   Yes.

15       Q.   Okay.  And what is this document?

16       A.   This is an e-mail, it appears, from me

17   to Jenese Karlen.  It seems Michael Polk was copied

18   in, and the subject was a complaint.

19       Q.   Okay.  And was this the first written

20   complaint that you filed with Liberty Mutual

21   regarding the subject matter of this lawsuit?

22       A.   Based on my recollection, yes.

23       Q.   Okay.  And do you -- do you know if HR

24   investigated this complaint?

25       A.   I was told that they did.

THOMPSON-Direct

1   referenced that no -- no teammate knew.  She

2   wasn't sitting by me when I pressed print, so

3   there had to have been a way that she was

4   monitoring the content that I was printing, or

5   what -- I don't know.  But there had to have been

6   some way.

7       Q.    Okay.  But you don't know how Ms.

8   Skibinsky was aware of this?

9       A.    No, I do not.

10      Q.    Is it possible that she saw things you

11  had printed out?

12      A.    I don't know how she would've seen things

13  unless it was done remotely.  Because I never

14  printed something and gave to her.

15      Q.    Did you ever -- was there ever a time

16  that you didn't immediately go to the printer when

17  you were printing out things?

18      A.    Every time I print something I get up --

19  the printer is literally like 30 seconds walk, if

20  that.  And I will stand there and wait for my stuff.

21  If it's been not used for awhile it has to warm up.

22  And I state that here.

23      Q.    Is it possible you ever hit the print

24  button a phone call came in and you had to take the

25  phone call and you didn't immediately go to the

THOMPSON-Direct

```
 1   And then after that you have to reset.  Now, I had
 2   a whole bunch of cases on my assignment that weren't
 3   mine, so I had to be slowly acclimated to them.
 4        Q.   Okay.  This is a review given in 2014 for
 5   what happened in 2013; correct?
 6             Right?  The period of this is January 1,
 7   2013 to December 31 of 2013 --
 8        A.   Right.
 9        Q.   -- not 2012?
10        A.   But I was not there.  No, I was just
11   referencing.  Because 2013 I was basically not
12   there.  But she referenced --
13        Q.   You were there for more than half the
14   year; correct?
15        A.   Correct.  But the issue that was
16   referenced, December of 2012, was the fact that
17   Ann Gambale left the team.  And being that I had
18   the lowest case load, I absorbed majority of her
19   cases.  And at that period we pushed disposition at
20   the end of the year.  So for 2013 it was now getting
21   used to and working her files.  'Cause I worked more
22   aggressively than my coworkers.
23        Q.   Let's see, the third bullet point
24   states:  Her failure to respond to a civil suit and
25   refer the document to the appropriate resource
```

THOMPSON-Direct

```
 1    resulted in Liberty inevitably being required to pay
 2    over $250,000.
 3            What was that about?
 4        A.    This -- I don't know what this is about.
 5    I was told by Debra Holt in 2014 that because of
 6    this bullet it was determined that I would be
 7    terminated.  While I was on disability I was told
 8    that Edie McGinn got an e-mail.  I didn't do
 9    anything wrong, because I think this had been
10    something going on from 2012 -- no, 2009.  It was
11    going on prior.  And whatever I was supposed to do,
12    I did it, but the manager failed to do something.
13    So being that I was not there, I was the one that
14    was made to be the one that was responsible.  And
15    that was the thing that she told me, that when I
16    was out a case blew up.  And they said when you
17    were coming back you would be terminated.
18        Q.    So it was Edie McGinn didn't do
19    something?
20        A.    Yes.
21        Q.    Okay.
22        A.    'Cause she was my supervisor.
23        Q.    Okay.  So it was Edie McGinn's fault?
24        A.    Basically there was an oversight, I was
25    told.  But I did everything that I had to do.  I
```

THOMPSON-Direct

1      A.   It was online.  I cannot confirm whether
2  I saw it in April or what time.  But I saw it
3  throughout the year.  Because it's there for you
4  to click on when you go in the system.
5      Q.   Okay.  And it had this thing saying that
6  you failed to respond which resulted in Liberty
7  being required to pay $250,000.  And you didn't ask
8  anybody about that?
9      A.   I didn't see -- like I literally did not
10 read this document.  I -- like right now is the
11 first time that I'm really seeing the details.
12 Because when I came back in April, in July I
13 ruptured my Achilles.  I was out.  When I came back
14 in August I was written up, told that I didn't do my
15 work from April to July, and that I had five late
16 action plans and 18 pieces of mail on my desk.
17 That was why I was written up.  Then they extended
18 it for another 30 days.  During that time there was
19 an issue with --
20     Q.   I'm -- let me just stop you.  I know you
21 got a story to tell.  But my question was very
22 simple:  You never raised this $250,000 thing in
23 your review that said Liberty had to pay, correct,
24 with anybody?  You never asked anybody about it.
25     A.   I never asked anybody about it, that's

THOMPSON-Direct

```
 1    that Latoya did not take ownership of her lack of
 2    work and she was very quick to put fault on her
 3    coworkers, what do you -- what was meant by that, to
 4    your understanding?
 5         A.   Latoya did not take ownership of her lack
 6    of work.
 7              That was alluding to the rebuttal that I
 8    wrote following the write-up. Debra Holt became the
 9    manager May of 2016, I believe.  And two
10    thousand --
11         Q.   You mean '14?
12         A.   '14.  Yes.
13         Q.   Okay.
14         A.   Thank you for correcting me.
15              And I returned to work the -- maybe two,
16    three weeks before.  And at that point I had met
17    with Edie.  We spoke about what I would be working
18    on moving forward.  And it took about a long time
19    for me to get access to the system.  So basically
20    once she became the manager, she was then trying to
21    figure out how to deal with the managerial role.
22    So the only feedback that I ever got from Debra
23    Holt from May to, I would say, the end of June --
24    because I ruptured my Achilles July the 6th or 7th
25    -- was please review claims overview, which is just
```

THOMPSON-Direct

1   putting in data for a case.  There was never

2   anything constructive. Debra Holt was somebody that

3   I superseded in performance in the unit continually.

4   And she basically said in the write-up in August

5   that I neglected 136 cases.  And I requested the

6   numbers.  And when I reviewed the cases, these were

7   all cases that came up on my assignment as of July

8   the 7th or eight, that weekend.  Like so from I was

9   out on disability all the way up until I returned,

10  Any action plan that came up, she put it on that

11  list.

12          And then when I questioned her about it

13  she said, Oh, well you have one-liners.  So her

14  saying that I did not take accountability was

15  basically her saying that because I went and

16  reviewed to show that this popped up while I was

17  away and it really wasn't on my box, then I'm not

18  taking responsibility.  Which is not valid.

19      Q.   So when you say that you superseded

20  Debra Holt in every category, I think -- or in

21  performance, I guess -- is that correct?

22      A.   With regards to disposition in the

23  settlement unit I was one of the top producer.

24  Prior to me it was Geraldine Gabrielle.

25      Q.   Okay.  Do you know anything about Ms.

THOMPSON-Direct

1    Q.   Okay.  Now, between October of 2014 when
2  you came off the written warning, and June of 2015,
3  were you on any warnings, probations, or anything
4  like that at work?
5    A.   No.
6    Q.   Okay.  So following the initial warning
7  and then the continuation and then the removal from
8  the written warning when they were happy with your
9  work, you didn't have any other issues until June
10 of 2015; is that correct?
11   A.   Right.
12   Q.   Okay.  And at some point during that
13 period of time your manager changed from Debra Holt
14 to Michelle Skibinsky; is that correct?
15   A.   Yes.  About a month prior to this letter.
16   Q.   Okay.  So sometime in May of 2015 --
17   A.   Approximately.
18   Q.   -- Ms. Skibinsky became your manager?
19        Okay.  And what did you understand this
20 document to be?
21   A.   I was -- it was just validating that I
22 was told in the meeting that I was on a verbal
23 warning.  The week before I was told I was going to
24 be doing voluntary coaching by Mrs. Skibinsky.
25 Prior to that nobody said anything was wrong with

THOMPSON-Direct

1   my work product.  She had been a manager for the

2   unit, you know, a little over a month.  Any

3   correspondence that she gave me, it was positive.

4   Latoya's responsive, and this and that.  So this

5   was shocking.  I'd never had a verbal warning, so

6   I didn't know what to expect.

7        Q.   Okay.  And was this solely related to

8   claim handling and management of your inbox?

9        A.   I was told about the copy and paste issue

10   that I violated the company -- she said I notice

11   that you occasionally put in your files copy work

12   from your coworkers.  And that's in violation of our

13   company's copy-and-paste policy.

14        Q.   Okay.  Is that part of this verbal

15   warning, though?

16        A.   Based on what she wrote here -- let me

17   just familiarize myself with it.

18             (Pause.)

19        A.   She post here, An update regarding the

20   courts online listed -- listing nor a copy and paste

21   of prior resolution strategy will not constitute an

22   updated resolution strategy.  I recommend that you

23   utilize other activities to manage your inbox.

24   However, this is at your own discretion.  You may

25   also consult with co - with your coworker or

THOMPSON - Direct

1   L A T O Y A    T H O M P S O N,   residing at

2           51 Willow Lane, Apt 102, Roselle, New

3           Jersey, having been first duly sworn, was

4           Examined and testified as follows:

5   DIRECT EXAMINATION BY MR. LUCKNER:

6       Q.   Good morning, Ms. Thompson.  I'm Steve

7   Luckner.  I hope you remember from yesterday.

8       A.   Yes.

9       Q.   I'm not gonna give you the instructions

10  again.  The same instructions and the rules apply;

11  you know, we keep our voices up, we try not to speak

12  at the same time so the court reporter can get it

13  down.

14          If any time you need a break, just go

15  ahead and let me know.  That's fine.  The only

16  caveat being is that if there's a question pending,

17  you go ahead and answer it first.  Okay?

18      A.   Okay.

19          MR. LUCKNER:  Let's see.  Why don't we

20  start with D-26.  Right?

21          (Memo dated 6/26/15 to Latoya Thompson

22  from Michele Skibinsky, Bates No. D-0163 thru

23  D-0164 is received and marked D-26 for

24  Identification.)

25          (Pause.)

THOMPSON - Direct

1    BY MR. LUCKNER:

2         Q.   I show you what's been marked as D-26

3    for Identification.  It is a -- consists of two

4    pages labeled D-0163 and 0164.

5              Have you ever seen this document before?

6         A.   Yes.

7         Q.   Okay.  And can you tell me what this

8    document is?

9         A.   This is a One Time Final Warning for

10   policy violation.

11        Q.   Okay.  And do you recall receiving this

12   document?

13        A.   Yes.

14        Q.   Okay.  And who provided this document to

15   you?

16        A.   Michelle Skibinsky.

17        Q.   Okay.  And were you aware that Liberty

18   Mutual had a policy with regard to internet usage

19   for employees?

20        A.   Yes, I knew that there were certain sites

21   that were blocked.  However, we use the internet

22   to do some aspects of our jobs.

23        Q.   Okay.  And this -- within this document

24   it lists the company policy with regard to the

25   internet.  And I believe I showed you a full copy

THOMPSON - Direct

1    of that policy yesterday.

2          Do you recall that?

3      A.   Yes.

4      Q.   Okay.  And were you aware that Liberty

5    Mutual had generated an internet usage report for

6    the three-month period of March to June of 2016 or

7    '15 with regard to your internet activity?

8      A.   I was made aware when it was presented to

9    me, yes.

10     Q.   Okay.

11          During -- during that period of time, did

12   you use the internet for nonbusiness-related

13   purposes at Liberty?

14     A.   Yes, I did.

15     Q.   Okay.  And how often did you do so?

16     A.   Basically, as my coworker Armando, I

17   would listen to YouTube, a motivational speech and

18   stuff in my headphones, and work.  We had double

19   monitors.  So it was something that most employees

20   did.

21     Q.   Other than work-related internet usage,

22   did you use it for personal use?

23     A.   As I just explained, I would use it and

24   listen to motivational messages on YouTube, which

25   is something that all Liberty employees engaged

THOMPSON - Direct

1    in --

2         Q.   Okay.

3         A.   -- while working.

4         Q.   Okay.  So is it your testimony that other

5    than listening to motivational speeches on YouTube,

6    you didn't use the internet at Liberty for anything

7    else personal?

8         A.   That is not correct to say.

9              I used the internet.  I don't recall

10   every site that I went on or everything that I did

11   do, but it was common practice for Liberty Mutual

12   employees to -- for example, Lauren Sanseverino used

13   the internet to plan her whole wedding.  Michelle

14   Skibinsky will go on the internet and forward us

15   articles that's not work related.  It was a common

16   practice for us to freely use the internet.  But,

17   of course, we weren't allowed to use certain

18   sites.  It would automatically be blocked.

19        Q.   Okay.  And as part of this case a -- the

20   internet usage report for you was produced.

21             Did you have a chance to review that

22   document?

23        A.   I was not given the document, even though

24   I requested it.  I was told it was in the fraud

25   department.  And then -- that was by Jenese

THOMPSON - Direct

1      Q.   Right.  That's -- and I refer to those

2    as the random midweek meetings.

3      A.   Okay.

4      Q.   So -- let's see.  On the last page, that's

5    your signature?

6      A.   Yes.

7      Q.   Okay.  And if I -- if I read this one,

8    it says, handwritten above it, Signature does not

9    mean agreement, only compliance?

10     A.   Yes.

11     Q.   Okay.  Is that your handwriting?

12     A.   Yes.

13     Q.   And as far as this written warning was

14   concerned, you know, what is -- what is your

15   understanding of the job performance at this point

16   in time that needed to be improved?

17     A.    In a lump sum, I needed to work faster.

18   That's what she said.  I needed to go faster.  I

19   needed to do everything faster.

20     Q.   Okay.

21     A.   Uhm...

22     Q.   And --

23     A.   Oh, and in here, she stated, I have seen

24   trends in your work which include resolution

25   strategies that fail to recognize critical issues

THOMPSON - Direct

 1   or inappropriate strategy, lack of execution of

 2   activities needed to bring claim to resolution or

 3   closure and ineffective inbox management, lack of

 4   proactive claims handling, and lack of receptiveness

 5   to coaching.

 6       Q.   Okay.  And that's -- you're reading from

 7   the paragraph right below Areas of Concern?

 8       A.   Correct.

 9       Q.   Okay.  So -- and I think that you said,

10   in a nutshell, in total, she wanted you to work

11   faster?

12       A.   Whenever -- whenever I asked, that's what

13   I was told.

14       Q.   Okay.  And was that similar -- I know

15   that we had talked yesterday about, I believe it was

16   in the fall of 2014 when you had been on a 30-day

17   written performance, and then it got extended for

18   30 days.  And you had told me that you were

19   basically working twice as fast and twice as hard

20   at that point in time, and that that satisfied

21   Ms. Holt to take you off the written warning; is

22   that accurate?

23       A.   That was accurate.

24       Q.   Okay.  And Ms. Skibinsky basically

25   telling you to work faster, do you think that she

THOMPSON - Direct

1    was looking for you to work even faster than you

2    had been at that point in time?

3         A.   Uhm --

4         Q.   And when I say, that point in time, I'm

5    referring to that fall of 2014 period.

6         A.   I just want to say that from I started

7    with Liberty I worked late.  I always worked harder

8    than my peers, which was why my disposition was the

9    highest in the unit.

10              So it's never an issue where Latoya's

11   working on -- on mild, for example, versus high.

12   I always work on high, because I really -- I really

13   take pride in my work product.  And it has been

14   validated through all those performance evaluation

15   that says my work quality, my resolution

16   construction, it's been concise, it's clear, and I

17   execute.

18              Me not working fast enough, that's never

19   been Latoya professionally.  These write-ups were

20   fabricated, and that's what was stipulated in it.

21   The difference of being written up is now I'm

22   working still on high with the anxiety over my head.

23   So instead of going home at 6:00 o'clock, I'm not

24   logging off until 10:00 o'clock.

25        Q.   Okay.  And when you say -- when you say

THOMPSON-Direct

```
 1   now, so ...
 2        Q.   Okay.
 3        A.   But it was in the morning.
 4        Q.   Is it between -- before 10:00 o'clock?
 5        A.   Usually.  I think so.
 6        Q.   Okay.  And you had -- you said you had
 7   come to give in your note that day --
 8        A.   Yes.
 9        Q.   -- with regard to going out?
10        A.   Because I was taken out of work.
11        Q.   Okay.  So you already had your doctor's
12   note --
13        A.   Yes.
14        Q.   -- on the 28th?
15             And when did you get the note from your
16   doctor putting you out as of the 28th?
17        A.   The night before.
18        Q.   Okay.  So the night of the 27th?
19        A.   Yes.
20        Q.   And that was the last day of your
21   probation period; right?
22        A.   Yes.
23        Q.   And did you give Michelle the note at the
24   huddle?
25        A.   No, I -- I -- I didn't get a chance to
```

THOMPSON-Direct

1    sit with Michelle.

2              At the huddle she comes and she says

3    whatever.  They ended up giving me a gift card and

4    a team -- the team presented me with a gift for the

5    baby.

6         Q.   Okay.

7         A.   And it was weird.  She said to me, Do

8    you have anything to say?  Which she never, ever

9    even acknowledges me at the huddle.  And if I have

10   any input, she rolls her eyes or looks to the floor

11   or -- or cuts me off.

12             So that was odd.  But the team was really,

13   you know -- they presented me with a team gift for

14   my ...

15        Q.   Okay.  And did you say anything to the

16   group when she asked if you wanted to say anything?

17        A.   No.  It was a awkward time to speak.  It

18   was just weird.  I don't know -- you know, I had

19   already said thank you.  But this is at the -- this

20   is before they presented me with a gift.  This was

21   early in the meeting.

22        Q.   Okay.

23        A.   And it was awkward.

24             Of course after I got the gift I said

25   thank you to the team, you know, but that was the --

THOMPSON-Direct

```
 1   the closing of the meeting.
 2        Q.   Okay.  And after the meeting ended, did
 3   you go to Michelle to give her the note?
 4        A.   No.  Michelle was in some sort of meeting.
 5             Based on that, I went to my desk and I
 6   started trying to clear my -- my desk.  And I was
 7   -- actually, I had a claims review, if I remember
 8   correctly.  So I had to be there to work something
 9   that day.  And I was on the phone for a while.
10        Q.   Okay.  And while you were still at work,
11   did Ms. Skibinsky reach out to you at all?
12        A.   While I was on a phone call, I got a
13   message on my phone -- on my computer saying,
14   Hey, can you come here?  Which she normally does
15   these random meetings.
16             And I messaged her back and I said, I'm
17   on a call.  Can I come after?  'Cause it was a
18   really important call with a customer.
19             And she said, Sure.  I'm in a conference
20   room.
21        Q.   Okay.  And when you got off the call
22   did you go and meet her in the conference room?
23        A.   When -- by the time I got off the call
24   and stood up, I started feeling like a shock in my
25   back.  I walked to the conference room right by
```

THOMPSON-Direct

1    the receptionist to see her.  She was not there.

2              I then went to the restroom and I started

3    having cramps.  And I called my doctor and I was

4    scared.  I went back to my desk and I said, Hey,

5    guys, I'm actually out, but I got to go to my

6    doctor.  I don't know what's going on.

7              Some of my coworker offered to drive me.

8    And I stated that a cousin of mine was coming to

9    meet me, but the doctor said to come immediately.

10             And I sent an e-mail to the team about

11   this saying I need to clear my desk.  If I'm okay,

12   I'll come back to clear my desk -- or whatever.

13             And on my way out with my bag, I see

14   Michelle.  She comes to me, Where you going?  Very

15   loud, in front of the whole team.

16             I said, I'm not feeling well.  I

17   actually came to the conference room to see you,

18   but you weren't there.

19             She said, Oh, I was in another one.

20             I said, Well, I didn't know.  And I just

21   sent an e-mail.  I'm actually not feeling good.

22   And I literally was in tears.

23             She starts walking, Well, I just need you

24   for a minute.  Where are you going?  Where are you

25   going?

THOMPSON-Direct

1          I said, Michelle -- Michelle, I'm

2   cramping.  Like, I'm not feeling good.  I'm sick.

3          She goes, Well, you can just come for a

4   minute.

5          I said, Listen, I just spoke to my doctor

6   and I'm going to my doctor.  If anything, I'll come

7   back and we can talk, but right now, I'm not feeling

8   well.

9          She harassed me to the door.  And I left

10  and I went to my doctor.  My blood pressure was

11  through the roof.

12      Q.   Okay.  You said -- you said you told the

13  guys that you were leaving.

14          Who are the guys?

15      A.   The teammates.

16      Q.   Which teammates did you tell?

17      A.   Armando sits directly across from me.

18  I  -- everybody was inquiring about me because I

19  stated that I was feeling ill.  And I was pregnant.

20      Q.   Okay.

21      A.   So it was a open discussion.

22      Q.   Okay.  So who else do you recall telling,

23  besides Armando?

24      A.    I think Kerry Lockburn -- Kerry

25  Lockburner offered to -- to drive me.

THOMPSON-Direct

1    BY MR. LUCKNER:

2        Q.   Okay.   I'm showing you what's been marked

3    as D-35 for Identification.   This document consists

4    of two pages labeled D-0220 and D-0221.

5            Have you ever seen these documents

6    before?

7        A.   No.

8        Q.   Okay.   Let's look at the bottom of the

9    first page.   It is a -- a UPS Next Day Air label.

10           Do you see that?

11       A.   Yes.

12       Q.   Okay.   And it says, Ship to Latoya

13   Thompson, Apartment 102, 51 Willow Lane, Roselle,

14   New Jersey, 07203-307.

15           Do you see that?

16       A.   Yes.

17       Q.   Is that your address?

18       A.   Yes.

19       Q.   Okay.   And then if you look at the next

20   page, in the Tracking Detail, it says Delivered

21   on August 2, 2016, at 9:50 a.m.

22           Do you see that?

23       A.   Yes.

24       Q.   It says, Left at front door.

25           Do you see that?

THOMPSON-Direct

1      A.   Yes.

2      Q.   Okay.  Did you ever get an overnight

3   package from Ms. Skibinsky?

4      A.   No.

5      Q.   But this is your address; correct?

6      A.   Yes.  Not at this time, I did not.

7      Q.   Not at this time...

8      A.   I did not.

9      Q.   You didn't get a package?

10     A.   No.

11     Q.   Although this indicates that a package

12   was left at the front door of the address where you

13   reside; correct?

14     A.   Yes.  And that is because the front door

15   is a shared front door.  It's not my front door.

16     Q.   This has your name on it though; right?

17     A.   Yes.

18     Q.   Okay.  Who else has -- who do you share

19   the front door with?

20     A.   I don't recall the neighbor who was

21   living there at this time.  But it's a shared front

22   door for two apartments.  And that's how it is.  So

23   it's outside, and there are two doors.  So it's two

24   doors beside each other and two apartments on --

25   for each door.

THOMPSON-Direct

```
 1        Q.   Is that your handwriting?

 2        A.   Yes.

 3        Q.   And it starts with an e-mail which

 4   begins on the bottom of the first page, which I

 5   guess  gives your summary of the discussion of the

 6   results of the investigation that you had with

 7   Michael Polk?

 8        A.   Yes.

 9        Q.   And do you recall speaking with Mr. Polk

10   on the 16th?

11        A.   Yes.  Per this documentation, yes.

12        Q.   Okay.  And is basically everything that

13   you and Mr. Polk discussed set forth in this e-mail

14   that you wrote to him?

15        A.   I would -- based on my recollection,

16   these were the strong points that came from that.

17        Q.   Okay.  And Mr. Polk had told you that

18   he was unable to substantiate your concerns; is

19   that correct?

20        A.   Yeah.  He said that they -- I mean, I

21   guess -- I'll just read 'cause it will refresh my

22   memory.

23        Q.   Okay.

24        A.   I said to him, Hi Mike, Thank you so

25   much for taking time to meet me today.  You provided
```

THOMPSON-Direct

```
 1    the conclusion to my formal complaint and declared
 2    that based on documents and interview had, there
 3    was nothing to substantiate inappropriate behavior
 4    by my manager or any violation of policy.  This is
 5    disappointing news given the extensive validation
 6    of all my claims submitted.  It is now confirmed
 7    that Michelle Skib -- Michelle Skibinsky
 8    discrimination harassment and bullying tactics/
 9    behavior to me is condoned by our company having
10    deemed not inappropriate.  I asked if the specialty
11    unit was interviewed as I had pointed out that I
12    was singled out from the rest of the unit and held
13    at a different standard.  You noted only names
14    mentioned in the investigations were interviewed.
15         Q.   If I can just stop you there.
16              What does that mean, You mentioned only --
17    you noted only names mentioned in the investigation
18    were interviewed?
19         A.   That's what he said.
20         Q.   But what does that -- what does that
21    mean?
22         A.   He said to me that only the names that I
23    gave him he interviewed.
24         Q.   Okay.  So it's the names that you gave him
25    as people with knowledge of the complaint?
```

```
 1            UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
 2        CIVIL ACTION NO. 2:18-cv-06092-MCA-CLW

 3    ----------------------------------------x
      LATOYA THOMPSON,
 4                                 DEPOSITION UPON
              Plaintiff,           ORAL EXAMINATION
 5                                       OF
              - vs -                LATOYA THOMPSON
 6
      LIBERTY MUTUAL INSURANCE,
 7
              Defendant.
 8    ----------------------------------------x

 9         T R A N S C R I P T  of the Deposition

10    of LATOYA THOMPSON, taken before DIANA L. R.

11    SENATORE, Certified Court Reporter and Notary

12    Public of the State of New Jersey, at the LAW

13    OFFICES OF BRIAN M. CIGE, 7 East High Street,

14    Somerville, New Jersey on Wednesday, November 14,

15    2018, commencing at 10:04 a.m.

16

17

18

19

20            SENATORE REPORTING, LLC.
            CERTIFIED COURT REPORTERS
21               (908) 500-1361
            senatorerep@embarqmail.com
22

23

24

25
```

```
 1    A P P E A R A N C E S:

 2    LAW OFFICE OF BRIAN M. CIGE
              7 East High Street
 3            Somerville, New Jersey 08876
      BY:  BRIAN M. CIGE, ESQ.
 4    Attorney for Plaintiff

 5

      OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC.
 6            10 Madison Avenue, Suite 400
              Morristown, New Jersey 07960
 7    BY:  STEVEN J. LUCKNER, ESQ.
           JASON W. ISOM, ESQ.
 8    Attorneys for Defendant

 9

10    A L S O   P R E S E N T:

11    KIM STARR, Counsel, Liberty Mutual Group, Inc.

12    MICHELLE SKIBINSKY

13    MATTHEW WIELGUS, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

1          UNITED STATES DISTRICT COURT
          **FOR THE DISTRICT OF NEW JERSEY**
2      CIVIL ACTION NO. 2:18-cv-06092-MCA-CLW

3   ---------------------------------------x
   LATOYA THOMPSON,
4                               DEPOSITION UPON
          Plaintiff,           ORAL EXAMINATION
5                                     OF
          – vs –               LATOYA THOMPSON
6                                (VOLUME II)
   LIBERTY MUTUAL INSURANCE,
7
          Defendant.
8   ---------------------------------------x

9          T R A N S C R I P T  of the Deposition

10   of LATOYA THOMPSON, taken before DIANA L. R.

11   SENATORE, Certified Court Reporter and Notary

12   Public of the State of New Jersey, at the LAW

13   OFFICES OF BRIAN M. CIGE, 7 East High Street,

14   Somerville, New Jersey on Thursday, November 15,

15   2018, commencing at 11:09 a.m.

16

17

18

19

20          SENATORE REPORTING, LLC.
          CERTIFIED COURT REPORTERS
21            (908) 500-1361
          senatorerep@embarqmail.com
22

23

24

25

```
 1    A P P E A R A N C E S:

 2    LAW OFFICE OF BRIAN M. CIGE
              7 East High Street
 3            Somerville, New Jersey 08876
      BY:  BRIAN M. CIGE, ESQ.
 4    Attorney for Plaintiff

 5
      OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC.
 6            10 Madison Avenue, Suite 400
              Morristown, New Jersey 07960
 7    BY:  STEVEN J. LUCKNER, ESQ.
           JASON W. ISOM, ESQ.
 8    Attorneys for Defendant

 9

10    A L S O   P R E S E N T:

11    KIM STARR, Counsel, Liberty Mutual Group, Inc.

12    MICHELLE SKIBINSKY

13    JOHN EDMUNDS, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

1              UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY
2          CIVIL ACTION NO. 2:18-cv-06092-MCA-CLW

3     ----------------------------------------x
      LATOYA THOMPSON,
4                                    DEPOSITION UPON
            Plaintiff,               ORAL EXAMINATION
5                                          OF
            – vs –                   LATOYA THOMPSON
6                                      (VOLUME III)
      LIBERTY MUTUAL INSURANCE,
7
            Defendant.
8     ----------------------------------------x

9          T R A N S C R I P T  of the Deposition

10    of LATOYA THOMPSON, taken before DIANA L. R.

11    SENATORE, Certified Court Reporter and Notary

12    Public of the State of New Jersey, at the LAW

13    OFFICES OF BRIAN M. CIGE, 7 East High Street,

14    Somerville, New Jersey on Wednesday,

15    November 28, 2018, commencing at 10:17 a.m.

16

17

18

19

20              SENATORE REPORTING, LLC.
             CERTIFIED COURT REPORTERS
21                (908) 500-1361
             senatorerep@embarqmail.com
22

23

24

25

```
 1    A P P E A R A N C E S:

 2    LAW OFFICE OF BRIAN M. CIGE
              7 East High Street
 3            Somerville, New Jersey 08876
      BY:  BRIAN M. CIGE, ESQ.
 4    Attorney for Plaintiff

 5

      OGLETREE, DEAKINS, NASH, SMOAK & STEWART, PC.
 6            10 Madison Avenue, Suite 400
              Morristown, New Jersey 07960
 7    BY:  STEVEN J. LUCKNER, ESQ.
           JASON W. ISOM, ESQ.
 8    Attorneys for Defendant

 9

10    A L S O   P R E S E N T:

11    KIM STARR, Counsel, Liberty Mutual Group, Inc.

12    MICHELLE SKIBINSKY

13    LUZ CABRALES, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```