1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

LATOYA THOMPSON                  §
                                 §
     Plaintiff,                  §
                                 §
VS.                              §    CIVIL ACTION
                                 §    NO. 2:18-cv-06092-MCA-JAD
                                 §
LIBERTY MUTUAL INSURANCE         §
                                 §
     Defendants.                 §


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL DEPOSITION OF

MICHAEL POLK

APRIL 11, 2019

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


        ORAL DEPOSITION OF MICHAEL POLK, produced as a

witness at the instance of the Defendants and duly sworn,

was taken in the above-styled and -numbered cause on the

11th of April, 2019, from 11:01 a.m. to 6:50 p.m., before

Melisa Duncan, CSR in and for the State of Texas, reported

by machine shorthand, at the offices of Ogletree, Deakins,

Nash, Smoak & Stewart, 8117 Preston Road, Suite 500,

Dallas, Texas, in accordance with the Federal Rules of

Civil Procedure and agreement hereinafter set forth.

2

1                    A P P E A R A N C E S

2    FOR THE PLAINTIFF(S):

3         Brian M. Cige
          cigelaw@gmail.com
4         LAW OFFICES OF BRIAN M. CIGE
          7 East High Street
5         Somerville, New Jersey 08876
          908.685.3775
6

7    FOR THE DEFENDANT(S):

8         Jason Isom
          jason.isom@ogletree.com
9         OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
          10 Madison Avenue, Suite 400
10        Morristown, New Jersey 07960
          908.415.6038
11

12   ALSO PRESENT:

13        Kim C. Starr - Liberty Mutual Group

14        Jenese Karlen

15

16

17

18

19

20

21

22

23

24

25

30

1    Latoya Thompson believed she was being treated unfairly?

2              MR. ISOM:   Objection.

3        Q.   (BY MR. CIGE)   You can answer.

4        A.   Can you clarify, be more specific?

5        Q.   Well, did she tell you that she believed she was

6    being discriminated against?

7              MR. ISOM:   Same objection.

8        Q.   (BY MR. CIGE)   You can answer.

9        A.   Can you specify time period?

10       Q.   I'm asking about conversations before you met

11   her, if you recall, first?

12       A.   Again, I don't recall if I met her in person

13   before I spoke to her on the phone or vice versa.

14       Q.   When you met with her in person, how long did you

15   meet with her for?

16       A.   I don't remember specifically.

17       Q.   Do you recall whether when you met with her in

18   person, she advised you that she believed she was being

19   discriminated against?

20             MR. ISOM:   Same objection.

21       Q.   (BY MR. CIGE)   You can answer.

22       A.   I don't remember the specifics of the

23   conversation.

24       Q.   Sir, I don't know if you answered.  Do you know

25   how long you met with her?

35

1    A.    Which meeting are you referring to?

2    Q.    Lunch meeting?

3    A.    No, it wasn't connected.

4    Q.    Okay.  Did you meet with anybody besides Latoya

5    Thompson while you were in New Jersey about her

6    complaints?

7    A.    Not that I recall.

8    Q.    Okay.  And when you left the meeting, did you

9    initiate an investigation or take any other action?

10        MR. ISOM:   Objection.

11   Q.    (BY MR. CIGE)  When you left the meeting, did you

12   take any action based on the information you learned in

13   the meeting with Ms. Thompson?

14   A.    Yes.

15   Q.    What action did you take?

16   A.    I conducted follow-up meetings.

17   Q.    With who?

18   A.    Michelle Skivinsky.

19   Q.    Anyone else?

20   A.    Not that I recall.

21   Q.    Was that meeting in person or over the phone?

22   A.    To the best of my recollection, it was

23   telephonic.

24   Q.    Do you have a recollection of whether you spoke

25   with Michelle Skivinsky about Latoya Thompson any time

40

1    Q.   Well, for the one that you said that you were

2  aware of her complaints before you met with her, so what

3  were those complaints that you were aware of?  I'm asking

4  you.

5    A.   Can you be more specific, please?

6    Q.   No.  I'm asking you what are the complaints that

7  you were aware of before you met with Latoya Thompson?

8    A.   I -- I am unable to answer the question as it's

9  been phrased.

10   Q.   How did you become aware of Latoya Thompson's

11 complaints about Michelle Skivinsky before you met with

12 Latoya Thompson?

13   A.   Is there a specific complaint you're referencing?

14   Q.   No, these are complaints you're referencing.  You

15 said you spoke to Latoya Thompson about her complaints

16 when you met with her in New Jersey.  I asked you whether

17 you had any awareness of her complaints before then.  You

18 said yes.  And then I'm following up and trying to find

19 out when you knew before the meeting.  So my question is:

20 What were you aware of about her complaint before you met

21 with her in New Jersey?

22   A.   I can't answer the question without more

23 specifics.

24   Q.   What specific do you need me to give you?

25   A.   Which complaint you're referring to.

42

1   with anybody else to advise you that she had complaints

2   which you eventually discussed with her in New Jersey?

3      A.   Yes.

4      Q.   Who?

5      A.   Laura Close.

6      Q.   I'm sorry, repeat?

7      A.   Laura Close.

8      Q.   Laura Close.  And who's Laura Close?

9      A.   Liberty Mutual employee.

10      Q.   Is she a supervisor?

11      A.   Which time period are you referring to?

12      Q.   At the time you spoke to her about Latoya

13   Thompson's complaint, what's her position with the

14   company?

15      A.   Human resource generalist.

16      Q.   Was she one of your subordinates?

17      A.   Yes.

18      Q.   Other than Laura Close, did you speak to anybody

19   in HR about Latoya Thompson's complaints before you met

20   with Latoya Thompson in New Jersey?

21      A.   Yes.

22      Q.   Who else?

23      A.   Ginny Bennett.

24      Q.   Can you spell, please.

25      A.   Last name Bennett, B as in boy, e-n-n-e-t-t.

43

1  Q.  First name?

2  A.  Ginny, G-i.

3  Q.  Spell it, please.

4  A.  G-i-n-n-y.

5  Q.  What was her position at that time?

6  A.  I think her title was principal human resource

7  generalist.

8  Q.  Was she Laura Close's supervisor?

9  A.  No.

10  Q.  Was Laura Close her supervisor?

11  A.  No.

12  Q.  Did you speak to anybody else in HR at that time

13  before you met with Latoya Thompson in New Jersey?

14  A.  No.

15  Q.  Did you speak to anybody who was not in HR about

16  Latoya Thompson and her complaints before you met with

17  Latoya Thompson in New Jersey?

18  A.  Not that I recall.

19  Q.  Who was the first one that you discussed Latoya

20  Thompson's complaints with, Laura Close, Ginny Bennett,

21  Latoya Thompson?

22  A.  I don't recall.

23  Q.  What involvement did Laura Close have in this

24  matter?

25  A.  She interviewed Latoya regarding Latoya's

44

1    concerns.

2        Q.   And that interview took place before you went to

3    New Jersey?

4        A.   Yes, based on my recollection.

5        Q.   Okay.  What about Ginny Bennett, what was her

6    involvement?

7        A.   She assisted in interviewing Latoya regarding

8    Latoya's concerns.

9        Q.   Was anybody else interviewed besides Latoya

10   Thompson regarding her complaints?

11       A.   Can you give a time reference, please.

12       Q.   Okay.  Between the time that HR first became

13   aware of Latoya Thompson's complaints about Michelle

14   Skivinsky and when you traveled to New Jersey in April or

15   May, was anybody else interviewed besides Latoya Thompson?

16       A.   Yes.

17       Q.   Who else?

18       A.   Michelle Skivinsky.

19       Q.   Who interviewed Michelle Skivinsky?

20       A.   Laura Close.

21       Q.   Was anybody else interviewed?

22       A.   Yes.

23       Q.   Who?

24       A.   I can't recall her last name.  Her first name

25   is -- I think it's pronounced DeMara, DeMari (phonetic).

45

1    Q.    Do you recall what her position was at the time?

2    A.    Yes.

3    Q.    What?

4    A.    She was the receptionist at the office in

5    Roseland.

6    Q.    Do you recall if anybody else was interviewed

7    besides Latoya, Michelle and DeMari?

8    A.    Not that I can recall.

9    Q.    And were these interviews written up and provided

10   to you before you came to New Jersey?

11             MR. ISOM:   Objection.

12   Q.    (BY MR. CIGE)   You can answer.

13   A.    Can you clarify when you say "written up"?

14   Q.    Well, here's my working assumption.  That when

15   somebody's interviewed, notes are taken or some other

16   manner of eventually documenting what was said by the

17   individual.  Were these statements submitted by Latoya

18   Thompson, Michelle Skivinsky and DeMari documented in any

19   way after they were taken?

20   A.    Yes.  Excuse me.  Yes.

21   Q.    Okay.  And were those statements, then, provided

22   to you before you came to New Jersey to meet with Latoya

23   Thompson?

24   A.    Yes.

25   Q.    So before the meeting, you had some idea what the

47

1    Q.    And what was your title at that time?

2    A.    Human resources manager.

3    Q.    Okay.  You had the meeting with Latoya Thompson

4    after you reviewed the interview notes of the three

5    individuals.  What did you do next regarding Latoya

6    Thompson's complaints?

7                MR. ISOM:  Objection.

8    Q.    (BY MR. CIGE)  You can answer.

9    A.    Can you be more specific, please?

10   Q.    Was the meeting with Latoya Thompson part of an

11   investigation?

12   A.    Yes.

13   Q.    Did you take a statement from her at the time?

14   A.    I'm sorry?

15   Q.    Did you take a statement from her at the time you

16   met with her?

17   A.    Can you specify the time you're referring to?

18   Q.    I think you said it was in April or May in

19   New Jersey?

20   A.    Yes.

21   Q.    So you -- did you take notes of that meeting?

22   A.    Yes.

23   Q.    What did you do with your notes?  Did you take

24   any actions as a result of what you learned?

25   A.    Which question would you like me to answer?

48

1    Q.   All right.  After the meeting with Latoya

2    Thompson, what actions, if any, did you take next?

3    A.   I interviewed others.

4    Q.   Did you interview anybody who had not already

5    been interviewed at that point?

6    A.   No, not to the best of my recollection.

7    Q.   So once all the interviews were completed, what

8    action did you take, if any?

9    A.   Can you be more specific, please?

10   Q.   Well, what was the purpose of your conducting all

11   these interviews?

12   A.   To review Latoya's concerns.

13   Q.   And once you had the information, what did you do

14   with the information?

15          MR. ISOM:   Objection.

16   Q.   (BY MR. CIGE)  You can answer.

17   A.   I consulted with corporate employee relations.

18   Q.   Who did you consult with?

19   A.   Latisha (phonetic) Fleming.

20   Q.   What was her position at that time?

21   A.   I don't know her official title.

22   Q.   Why did you discuss it with her?

23   A.   We were reviewing Latoya's concerns to determine

24   if there were any policy violations.

25   Q.   And what did you discuss?

52

1     Q.   Did you write up an investigation report after

2  all the interviews were taken?

3     A.   Yes.

4     Q.   Who did you present that report to?

5     A.   Kim Starr.

6     Q.   Anybody else?

7     A.   Latisha Fleming.

8     Q.   Anybody else?

9     A.   Not that I recall.

10     Q.   Was it a formal report?

11           MR. ISOM:  Objection.

12     A.   Can you define "formal"?

13     Q.  (BY MR. CIGE)  Did it contain any summaries of

14  the statements that were taken, perhaps attaching the

15  actual full statements, drawing some conclusions?

16           MR. ISOM:  Objection.  That's a multipart

17  question.

18     Q.  (BY MR. CIGE)  Did the investigation report draw

19  any conclusions?

20           MR. ISOM:  I would just object.  The report

21  itself is in the privilege log.  It's privileged.  So

22  any -- I would instruct him not to answer about any

23  contents of the actual report.

24     Q.  (BY MR. CIGE)  At the conclusion of the

25  investigation, were any changes made that affected Latoya

53

1   Thompson?

2               MR. ISOM:  Objection.

3       Q.   (BY MR. CIGE)  You can answer.

4       A.   Can you be more specific, please?

5       Q.   After you completed your investigation, were any

6   actions taken as a result of what was learned?

7       A.   Yes.

8       Q.   What actions were taken?

9       A.   I met with Latoya and provided her with the

10  conclusion of my investigation.

11      Q.   So this was a second meeting with Latoya

12  Thompson?

13      A.   A meeting, meaning discussion, so telephonic or

14  in person.

15      Q.   Okay.  So this is a telephone call after the

16  conclusion of the investigation?

17      A.   Yes.

18      Q.   What did you tell her?

19      A.   Variety of things.  I thanked her for her time

20  and for bringing the concerns to the attention of the

21  company and myself.

22      Q.   Did you tell her whether you validated her

23  complaints?

24              MR. ISOM:  Objection.

25      A.   Can you restate the question, please?

54

1    Q.   (BY MR. CIGE)  Did you tell her whether you

2    confirmed that the allegation she was making had merit?

3              MR. ISOM:   Same objection.

4    Q.   (BY MR. CIGE)  You can answer.

5    A.   I'm sorry.  At the very last you faded.  There's

6    a little feedback every now and then.  I apologize.

7    Q.   That's okay.

8              Did you tell her that there was merit to her

9    allegations?

10   A.   No, I did not.

11   Q.   Did you tell her there was no merit to her

12   allegation?

13   A.   No, not that I recall.

14   Q.   Now, at the time that you were involved in this

15   investigation, had you been similarly involved in any

16   other investigations regarding harassment and

17   discrimination against an employee of Liberty Mutual?

18             MR. ISOM:   Objection.

19   A.   Can you be more --

20   Q.   (BY MR. CIGE)  You can answer.

21   A.   Can you be more specific, please?

22   Q.   Yeah.  Was this your first investigation?

23   A.   Can you give a time reference or --

24   Q.   In your whole career, had you ever been involved

25   in any other investigations of allegations of harassment

66

1   aware?

2       A.   During which period of time are you referencing?

3       Q.   I'm asking if you're aware of whether Liberty

4   Mutual has an internal EEO as an Equal Opportunity officer

5   or affirmative action officer?

6       A.   Can you be more specific to the time you're

7   referencing?

8       Q.   During the time of your investigation of Latoya

9   Thompson's complaints.

10      A.   To my knowledge, there's no one at Liberty Mutual

11  with that job title.

12      Q.   Okay.  When you become aware in your

13  investigation of allegations of harassment and

14  discrimination, is there anyone you need to report that to

15  that goes beyond the investigation that you're conducting?

16      A.   It depends.

17      Q.   So I'm asking you if you concluded there was

18  harassment or discrimination as part of your

19  investigation, is there someone you would report that to

20  outside of your investigation?

21              MR. ISOM:   Object.

22      A.   Can you clarify outside of your investigation?

23      Q.   (BY MR. CIGE)  Is there somebody in HR who has

24  the responsibility to deal with confirmed cases of

25  harassment or discrimination?

114

1  from Latoya Thompson to Jenese Karlen with a formal

2  complaint.  And on the top, it looks like it's an email

3  from you to Latoya advising that you're going to conduct

4  an investigation; is that right?

5       A.   I haven't had a chance to review the document.

6       Q.   I'll give you a minute.  Are you done?

7       A.   Yes.

8       Q.   So you've seen the emails in 39 before?

9       A.   Yes, I generally recall this email.

10      Q.   Okay.  So it looks like on the bottom of the

11  No. 984, that a formal complaint was sent by Latoya

12  Thompson to Jenese Karlen copying you and then you

13  responded to Latoya saying you were going to be conducting

14  the investigation, correct?

15      A.   Not correct.  I said I would initiate the

16  investigation, not specifically I would conduct the

17  investigation.

18      Q.   Okay.  Whose decision was it that you were going

19  to initiate the process?

20      A.   I guess, it would be my decision to initiate the

21  process.

22      Q.   I'm not hearing you.

23      A.   I said I guess, it would be my decision that I'm

24  going to initiate the process.

25      Q.   Okay.  How long did the investigation take from

11

1    Q.    When were you first hired by Liberty Mutual?

2    A.    Around April 2010.

3    Q.    What position were you hired for?

4    A.    I think the title was principal human resources

5    generalist.

6    Q.    And at any time from April 2010, when you were

7    hired, until today, have you had any different positions

8    at Liberty Mutual?

9    A.    Yes.

10    Q.    When did you change positions after your first

11    position as principal HR generalist?

12    A.    Approximately June of 2010.

13    Q.    Okay.  So what was your next position at that

14    time?

15    A.    My recollection is human resources manager.

16    Q.    Did you have a position after the human resources

17    manager position?

18    A.    Yes.

19    Q.    What was the next position?

20    A.    Field human resources manager.

21    Q.    And when did you start that position?

22    A.    Approximately 2012.

23    Q.    Do you recall what month?

24    A.    I do not.

25    Q.    Okay.  Did you have a position after the field HR

12

1  manager position?

2      A.    Yes.

3      Q.    What was that?

4      A.    I believe the title was human resources manager.

5      Q.    When did that start?

6      A.    Approximately 2014.

7      Q.    Do you recall what month?

8      A.    I do not.

9      Q.    Okay.  Now, is the field HR manager position that

10  you moved to in 2012 a promotion from the HR manager

11  position you had starting 2010?

12     A.    No.

13     Q.    Is it considered a lateral?

14     A.    Yes.

15     Q.    Okay.  So when you went from field HR manager in

16  2012 to HR manager in 2014, that wasn't a demotion?

17     A.    No.

18     Q.    Okay.  Did you have a position after the 2014 HR

19  manager position?

20     A.    I'm sorry, could you repeat?  Did you say 2012?

21     Q.    No, I'm asking after the 2014 position when you

22  became HR manager, did you have another position after

23  that?

24     A.    Yes.

25     Q.    What was the next one?

13

1    A.    Talent adviser.

2    Q.    When did that start?

3    A.    To the best of my recollection, 2016.

4    Q.    Do you recall the month?

5    A.    Not specifically.

6    Q.    Was that position still within human resources?

7    A.    Yes.

8    Q.    Was that considered a promotion?

9    A.    No.

10   Q.    Was it considered a demotion?

11   A.    No.

12   Q.    Okay.  Did you have another position after that

13   talent position?

14   A.    Yes.

15   Q.    What was the next one?

16   A.    Employee relations manager.

17   Q.    When did that start?

18   A.    About February 2017.

19   Q.    Have you had any positions since the employee

20   relations manager position?

21   A.    No.

22   Q.    So you've had that position from February 2017 to

23   present?

24   A.    Yes.

25   Q.    Can you describe briefly what your

21

1      A.    It could be the training topic.

2      Q.    Well, can you tell me how many periodic trainings

3  you've had since February of 2017?

4      A.    I don't recall.

5      Q.    Is there a sign-in, sign-out type of document

6  when you go to these training sessions?

7      A.    It depends on the training.

8      Q.    Do you recall the topics of any of the periodic

9  training that you've had in your current position?

10     A.    Yes, some.

11     Q.    Okay.  What are they?

12     A.    Systems training.

13     Q.    Anything else?

14     A.    Interactive skill/communications training.

15     Q.    Anything else?

16     A.    Investigations training.

17     Q.    Anything else?

18     A.    Management training.

19     Q.    Anything else?

20     A.    Setting -- setting objectives training.

21     Q.    Anything else?

22     A.    Conducting an employee performance reviews

23  training.

24     Q.    Anything else?

25     A.    Change management training.

22

1    Q.    Anything else?

2    A.    How to develop others training.

3    Q.    Anything else?

4    A.    There may have been others.  Those are the ones I

5    can think of at this moment.

6    Q.    Now, as to whether you've had training that's not

7    periodic, but that was tailored specifically for you, have

8    you had any trainings since February of 2017?

9         MR. ISOM:  Objection.

10    Q.    (BY MR. CIGE)  You can answer.

11    A.    Nothing that I can think of.

12    Q.    Okay.  Since February of 2017, have you had any

13    training on harassment or discrimination in the workplace?

14    A.    Yes.

15    Q.    Have you had that training since February of

16    2017?

17    A.    Yes.

18    Q.    On one or more than one occasion?

19    A.    More than one.

20    Q.    How many times?

21    A.    I don't remember specifically.  I can give you a

22    ballpark figure.

23    Q.    I'll start with that.

24    A.    Specific to harassment, discrimination since then

25    three to five, six.

28

1    A.    About October 2018.

2    Q.    Do you know who Latoya Thompson is?

3    A.    Yes.

4    Q.    When did you first know who she was?

5            MR. ISOM:   Objection.

6    A.    Can you be more specific, please?

7    Q.    (BY MR. CIGE)   Yeah.   When did you first hear

8    about her?

9    A.    I don't recall.

10   Q.    Have you ever met her face to face?

11   A.    Yes.

12   Q.    When did you first meet her?

13   A.    I don't recall the specific date.

14   Q.    Well, give me the year, we'll start with that.

15   A.    I believe it was 2016.

16   Q.    Do you recall the month?

17   A.    Best of my recollection, April or May time frame.

18   Q.    Do you know what the circumstances were?

19           MR. ISOM:   Objection.

20   Q.    (BY MR. CIGE)   You can answer.

21   A.    I met her in the office in New Jersey.

22   Q.    What was the purpose of the meeting?

23   A.    To discuss some concerns that she had expressed.

24   Q.    What were those concerns?

25   A.    There were a number of concerns.

29

1    Q.    What were they?

2    A.    I don't recall the specifics.  Generally her

3  manager was not treating her fairly.

4    Q.    Anything else?

5    A.    Her manager was treating her differently than

6  others.

7    Q.    Anything else?

8    A.    There were others.  I can't recall the specifics.

9    Q.    Do you recall the name of the manager she was

10  complaining about?

11    A.    Michelle Skivinsky.

12    Q.    Okay.  So with the premise based on your

13  testimony that you met with her approximately April or May

14  of 2016, my question is:  Prior to meeting her, did you

15  have any phone conversations with her about her concerns?

16    A.    I have spoken with her by telephone.  I can't

17  recall if I spoke with her by telephone first or I met her

18  in person first.

19    Q.    Prior to meeting with Ms. Thompson, did you have

20  any conversations with Michelle Skivinsky about Latoya

21  Thompson?

22    A.    I've had conversations with Michelle Skivinsky

23  about Latoya Thompson.  I don't know the sequence, if I

24  spoke to Michelle about Latoya before I met with Latoya.

25    Q.    Do you have a more specific memory about why

59

1    Q.   Did you ever communicate with her by phone or

2  email or in person about any complaints subsequent to the

3  conclusion of the investigation?

4    A.   Can you repeat that, please?

5         MR. CIGE:  Can you read back, Ms. Court

6  Reporter?

7         (Requested portion was read.)

8         MR. ISOM:  You're referring to new

9  complaints?

10         MR. CIGE:  Yes.

11    A.   Not that I recall.

12    Q.   (BY MR. CIGE)  Are you aware of whether

13  Ms. Thompson ever filed an EEO complaint?

14         MR. ISOM:  Just object to the extent it

15  implicates something you learned from your attorneys.  If

16  it was something you learned from your attorneys, I

17  instruct you not to answer.

18    A.   I can't answer that question.

19         MR. CIGE:  Is it privileged, is that why?

20         MR. ISOM:  Yes, if he learned it through his

21  attorneys.

22         MR. CIGE:  Okay.

23    Q.   (BY MR. CIGE)  As part of your interviewing

24  Ms. Thompson, did she ever tell you directly that she had

25  filed an EEO complaint?

60

1    A.    I -- I don't recall.

2    Q.    Okay.

3          MR. CIGE:  Take a 10-minute break, it's

4    about another hour.

5          MR. ISOM:  Want to do lunch now?

6          MR. CIGE:  Yeah.  Jason must be hungry if

7    he's on New Jersey time.

8          (Recess from 1:17 p.m. to 2:06 p.m.)

9    Q.    (BY MR. CIGE)  Welcome back.  We're back on the

10   record.  Just a couple of questions about what we already

11   went over that came to my mind during the break, and then

12   we'll move forward.  So my first question is:  How did you

13   get assigned to do the investigation on Latoya -- Latoya's

14   complaints?  Did somebody give you that task?

15   A.    No.  Excuse me.  No.

16   Q.    So how did it come to be that you were involved

17   with her investigation?

18   A.    Latoya sent an email to me.

19   Q.    Do you know why she sent it to you?

20         MR. ISOM:  Objection.

21   Q.    (BY MR. CIGE)  Do you know why she sent the email

22   to you?

23   A.    I don't.

24   Q.    Okay.  Had you -- did somebody have to sign off

25   on you being involved in the investigation, perhaps a

68

1   hundreds, have you ever concluded that harassment or

2   discrimination took place?

3                 MR. ISOM:  Objection.  He didn't -- he

4   didn't testify to hundreds.

5        Q.   (BY MR. CIGE)  Well, we'll let the record stand

6   for what it is.  I'll rephrase that question without that

7   number then.  So here's my question:  During all the

8   investigations that you've participated in, have any

9   concluded that harassment or discrimination actually took

10  place?

11                MR. ISOM:  Objection.

12       Q.   (BY MR. CIGE)  You can answer.

13       A.   Harassment, discrimination are legal terms.  So

14  I'm not sure I'm the appropriate person to answer that

15  question.

16       Q.   Well, as part of your investigation report, do

17  you make a determination as to whether there was

18  harassment or discrimination that occurred?

19       A.   When you say "investigation report," what are you

20  referring to?

21       Q.   Okay.  Well, you've already testified that in

22  Latoya Thompson's situation, that you oversaw an

23  investigation, you took a statement from her, eventually

24  you completed an investigation report, correct?

25       A.   And I may not have -- may not have understood

69

1   when you said investigation report.  So I should have

2   asked clarification on what you meant by that.

3       Q.   Well, you compiled the witness statements that

4   you testified had been taken?

5       A.   There was a report completed for that case, yes.

6       Q.   Okay.  Were you involved in the completion of

7   that report?

8       A.   Yes, I was involved in some level in the

9   completion of that report.

10      Q.   Did the report have a conclusion?

11           MR. ISOM:  Just object as earlier.  The

12  report is in the privilege log and the contents of the

13  report, we've taken the position that they're privileged.

14           MR. CIGE:  I understand.  At this point I'm

15  not asking what the conclusion is.  I'm just asking is:

16  Was there a conclusion?

17           MR. ISOM:  Was there a conclusion to the

18  investigation, or was there a conclusion in the report?

19  Because that's two different things.

20           MR. CIGE:  To the report.

21           MR. ISOM:  So I take the position that

22  that's privileged because you're talking about what's in

23  the report.

24      Q.   (BY MR. CIGE)  Okay.  Was there a conclusion to

25  the investigation?

112

1   Do you recall that we were asking questions and you were

2   answering about an investigation you did because of

3   complaints she made about Michelle Skivinsky?  Do you

4   recall that?

5        A.   Yes.

6        Q.   Okay.  So this appears to be an earlier complaint

7   that she made against Debra Holt.  Do you see that?

8        A.   Yes, she indicates that in her email -- this

9   email.

10       Q.   Okay.  Did you conduct a similar investigation of

11  this complaint as you did of the later complaint against

12  Michelle Skivinsky?

13            MR. ISOM:   Objection.

14       Q.   (BY MR. CIGE)  You can answer.

15       A.   I don't recall the specifics of this complaint.

16       Q.   Well, do you -- do you recall doing an

17  investigation of complaints by Latoya Thompson against

18  Debra Holt?

19       A.   Could you clarify the question is me or is me

20  inclusive of --

21       Q.   This is an email that you're copied on?

22       A.   Yes.

23       Q.   Okay.  So did you have conversations with anybody

24  else on the email, in particular Jenese Karlen, who it's

25  sent to, about conducting an investigation regarding this

113

1    complaint?

2        A.   I don't recall the specifics.

3        Q.   Are you aware of whether there was an

4    investigation or not?

5        A.   I don't recall.

6        Q.   When you're doing the investigation, the

7    complaints against Michelle Skivinsky, did you investigate

8    whether Latoya Thompson had prior complaints of harassment

9    or discrimination against any other Liberty Mutual

10   employees?

11       A.   I don't recall the specifics.

12       Q.   Okay.  Do you know whether Jenese Karlen herself

13   did harassment and discrimination investigations?

14       A.   I'm sorry, can you repeat the question?

15       Q.   Yeah.  Did Jenese Karlen do harassment and

16   discrimination investigations?

17       A.   I don't know.

18       Q.   Again, we've mentioned this number before, but

19   it's not that long.  It's 39.  I just noticed her name in

20   the middle of it.  Can you turn to that page?  It looks

21   like there's an email from Latoya?

22               MR. ISOM:  Did you say page 39 or

23   Exhibit 39?

24               MR. CIGE:  Exhibit 39.

25       Q.   (BY MR. CIGE)  On the bottom it's another email